## GREGORY v CINCINNATI INCORPORATED

Docket No. 98284. Argued March 9, 1995 (Calendar No. 8). Decided August 15, 1995. Rehearing denied *post,* 1212.

Michael Gregory brought a products liability action in the Wayne Circuit Court against Cincinnati Incorporated and Addy-Morand Machinery Company, seeking damages for injuries sustained while operating a press brake designed and manufactured by Cincinnati and sold or distributed by Addy-Morand. The plaintiff alleged that Cincinnati negligently designed the press brake in 1964 and that it had a continuing duty to repair or recall the product by installing various safety guards, and that Addy-Morand had breached an implied warranty in selling a defectively designed press brake. The court, J. Phillip Jourdan, J., denied the defendants' motion in limine to preclude evidence of any continuing duty and subsequently denied Cincinnati's motion for a directed verdict. Thereafter, judgment was entered on a jury verdict for the plaintiff against both defendants. The Court of Appeals, DOCTOROFF, C.J., and SAWYER, J. (MURPHY, J., dissenting), reversed and remanded, finding that Michigan law does not impose on manufacturers a duty to repair or recall a product after its release into the stream of commerce, and that while a manufacturer has the duty to warn of a latent defect, it does not have a duty to repair the defect (Docket No. 135587). The plaintiff appeals.

In an opinion by Justice RILEY, joined by Chief Justice BRICKLEY, and Justices BOYLE and WEAVER, the Supreme Court *held:*

There is no continuing duty to repair or recall a product. The inquiry in a design defect case requires the trier of fact to assess the risks and utility of the product at the time of manufacture. Evidence of conduct after the date of manufacture improperly shifts the focus from premanufacturing decisions and has the potential to taint any finding of liability. Any duty to repair or recall is appropriately left to administrative agencies or the Legislature. In this case, the continuing duty

REFERENCES
Am Jur 2d, Products Liability § 362, 365, 377.
See ALR Index under Products Liability.

instruction was error requiring reversal for both the manufacturer and the seller.

1. The central problem in a negligent design case in admitting postmanufacture evidence or imposing a postmanufacture duty to repair or recall is the possibility of taint or jury confusion with respect to any finding of negligence at the time of manufacture. Generally, before there can be a continuing duty to warn, repair, or recall, there must be a defect or an actionable problem at the point of manufacture. When such a distinction is not clearly presented, the potential for jury confusion is great, as well as the possibility of holding a manufacturer liable for postmanufacture improvements, contrary to Michigan law.

2. A claim of error in the presentation of the theory to repair or recall a product or in some manner prevent an accident questions the conduct of the manufacturer, not the condition of the product. It posits a postmanufacturing duty to cure after a product leaves a manufacturer's control. When a product is originally defective and proof of that is advanced, a continuing duty to repair or recall theory serves nothing but to cloud the initial finding of negligence. When the product is rendered defective in light of improved technology, the commensurate effect is to discourage improvements in technology if the improvements can later serve as a basis of liability.

3. Under Michigan law, the only postmanufacture duty imposed on a manufacturer has been the duty to warn when a defect existed at the point of manufacture, but was not discoverable at that time by either the manufacturer or the consumer. Focusing on postmanufacture conduct in a negligent design case improperly shifts the focus from point-of-manufacture conduct and considers postmanufacture conduct and technology that accordingly has the potential to taint a jury's verdict regarding a defect. In this case, with liability premised on the risk-utility test, a continuing duty instruction adds nothing to the plaintiff's case but potential confusion.

4. Generally, a manufacturer is under no duty to modify its product in accordance with current state of the art safety features because such a duty is incompatible with a rule requiring that liability turn exclusively on whether the product meets the state of the art at the time of production. Imposing a duty to update technology would place an unreasonable burden on manufacturers, and would discourage development of new designs that might form the bases for suits or result in costly repair and recall campaigns.

5. In this case, some proof was offered of negligent design as

of 1964; however, presentation of the continuing duty theory and its accompanying evidence tainted this otherwise permissible finding. The evidence adduced after 1964 was irrelevant and prejudicial because it invited the jury to improperly focus on postmanufacture technology in assessing negligence, thereby clouding its finding of liability. Moreover, the jury instructions further confused and tainted the jury's finding by inviting it to find liability on the basis of improvement in technology postmanufacture. Accordingly, Cincinnati is entitled to a new trial because there is no principled means of finding these errors harmless. Because the liability against both Cincinnati and Addy-Morand required the finding of a design defect, the decision of the Court of Appeals must be affirmed and the case remanded for a new trial.

Affirmed.

Justice CAVANAGH, joined by Justice MALLETT, dissenting, stated that the verdict against the seller should be reinstated because no error occurred with respect to the seller. The seller was never mentioned in the substance of the trial, no independent evidence was offered relating solely to it, none of the postmanufacture evidence related to it, jury instructions relating to it clearly restricted the jury's focus to the point of sale, and it never objected to anything confusing in the instructions.

The evidentiary points of error with respect to the verdict against the manufacturer were either unpreserved or harmless. The trial court erred in failing to clarify in its instructions that the jury first had to determine that the product was unreasonably dangerous at the time of sale before it could consider the postsale evidence in determining whether the manufacturer breached the standard of care. However, the manufacturer confused the issues by presenting the bulk of postsale evidence and theories to the jury in a strategic attempt to shift blame for a dangerous machine to the owner of the machine, the employer of the plaintiff. The court also failed to give the defendant's proposed instructions that would have limited the determinative point for a design defect to the point of sale. The error was harmless, however, because there was substantial evidence that the press brake was unreasonably dangerous under the prevailing standards in 1964 and because the postsale evidence was presented primarily by the defendant or by the plaintiff without objection.

Justice LEVIN, dissenting in part, stated that if a product is defective at the time of sale—whether through faulty manufacture or negligent design—the manufacturer is liable for all harm proximately caused by the defect. No additional finding

of a breached duty is needed to impose liability. It does not follow, however, that there can never be a postsale obligation to recall a product. In some cases, a manufacturer may have an obligation to protect against dangers posed by products that were not defective when originally sold. A product may prove to be unreasonably dangerous without having been negligently designed. In such a case, a manufacturer who learns or should learn of an unreasonable product-related danger has an obligation to take reasonable steps to prevent the product from causing harm.

Recognizing a postsale obligation only has meaning when the product is not initially defective. Any postsale obligation should be viewed as arising out of the general duty to exercise reasonable care for the safety of others. Where an unreasonable danger of a product was unknown and unknowable at the time of sale, a manufacturer who later learns of the danger is under an obligation to exercise reasonable care to protect against that harm. In many cases, that obligation will require warnings. In others, meeting the standard of reasonable care may require recall. Warnings and repairs properly are viewed not as different obligations but simply different points on a continuum of postsale precautions. A recall is simply a warning to buyers accompanied by an offer to bear the cost of making needed changes in the defective product.

It was error to permit the plaintiff to pursue a theory based on a postsale obligation to repair or recall. The danger posed by the press brake was well known when it was manufactured, and had been widely recognized for decades. This was not a case of an unreasonable danger that was unknown and unknowable at the time of manufacture. If the manufacturer, Cincinnati, is liable, such liability should be predicated on a product defect existing then.

The instructional error and the error in the admission of evidence was not harmless and requires that the verdict against Cincinnati be reversed. However, the verdict against the seller, Addy-Morand Machinery Company should be affirmed. The errors with regard to the introduction of evidence and jury instructions concerning the manufacturer did not taint the verdict against the seller. In contrast to the instructions regarding the design defect claim against Cincinnati, the instructions on the breach of warranty claim against Addy-Morand unambiguously required the jury to consider the condition of the press brake at the time it left Addy-Morand's control.

The verdict against Addy-Morand did not necessarily derive

from the verdict against Cincinnati. There was some proof offered of negligent design as of the time of manufacture, and defense counsel conceded that Gregory presented evidence that the press brake was defective at that time. Neither defendant challenged the sufficiency of the evidence. It was this evidence, and not the verdict against Cincinnati, that supported a verdict against Addy-Morand.

Confusion between the breach of warranty claim against Addy-Morand and the instructions that Cincinnati had a continuing obligation could have been avoided by emphasizing the differences between the claims. The defendants neglected to make the distinction as a matter of trial strategy, and it therefore cannot form the basis for a claim of error.

202 Mich App 474; 509 NW2d 809 (1993) affirmed.

PRODUCTS LIABILITY — DESIGN DEFECTS — CONTINUING DUTY TO REPAIR OR RECALL — POSTSALE CONDUCT.

There is no continuing duty to repair or recall a product; the inquiry in a design defect case requires an assessment of the risks and utility of the product at the time of manufacture; evidence of conduct after the date of manufacture improperly shifts the focus from premanufacturing decisions and has the potential to taint any finding of liability.

*Allen T. Eaton, David T. Smorodin,* and *Ernest W. McIntosh, Jr.,* and *Kathleen Wilson* for the plaintiff.

*Harvey, Kruse, Westen & Milan, P.C.* (by *Dennis M. Goebel* and *Maurice A. Borden*), for the defendants.

Amici Curiae:

*Plunkett & Cooney, P.C.* (by *Mary Massaron Ross*), for Michigan Defense Trial Counsel, Inc.

*Mark Granzotto, Jeffrey T. Meyers,* and *Richard E. Shaw* for Michigan Trial Lawyers Association.

RILEY, J. At issue in this case is the propriety of a continuing duty to repair or recall theory of

products liability in a negligent design case. The inquiry is whether Michigan law recognizes a continuing duty to repair or recall and, if not, on these facts, whether it was error to introduce this theory and its accompanying evidence. We hold that there is no continuing duty to repair or recall a product. The inquiry in a design defect case requires the trier of fact to assess the risks and utility of the product at the time of manufacture. Evidence of conduct after the date of manufacture improperly shifts the focus from the premanufacturing decision and has the potential to taint any finding of liability. Moreover, we are persuaded that any duty to repair or recall is appropriately left to administrative agencies or the Legislature, who can better determine under what circumstances a duty should be imposed. In this case, we hold that the continuing duty instruction was error requiring reversal for both the manufacturer and the seller. Hence, we affirm the decision of the Court of Appeals.

I

On May 16, 1986, plaintiff Michael Gregory, a sheet metal worker was injured while operating a press brake owned by his employer Sheet Metal Industries (SMI). The press brake was designed and manufactured by Cincinnati Incorporated in 1964 and sold or distributed by Addy-Morand Machinery in the same year.

A press brake is an industrial machine used to shape and form sheet metal. While there are several types of press brakes, a general purpose press brake is at issue in this case. This press brake allowed the operator to shape all types and sizes of metal. To activate, the operator would depress a foot pedal causing the "ram" to descend

onto the metal, thereby forming whatever shape is needed.

On the day of the accident, plaintiff was using this general purpose press brake when a piece of metal popped out of the machine and fell on the floor. He bent down to pick it up and placed his left hand on the press brake's "point of operation," i.e., the area where the machine actually performs the bending and shaping. The testimony indicated that in doing so he either stepped on the foot pedal, causing the machine to cycle, or already had his foot on the pedal and depressed it even further when bending down, thus causing it to cycle. Consequently, plaintiff's thumb was severely crushed, later requiring amputation.[1]

Plaintiff brought suit against Cincinnati and Addy-Morand. He alleged that Cincinnati negligently designed the press brake because it lacked adequate guarding at the point of operation and on the foot pedal. Moreover, plaintiff alleged that Cincinnati had a continuing duty to repair or recall the product by installing various safety guards. Against the seller Addy-Morand, plaintiff alleged breach of implied warranty in selling a defectively designed press brake. However, plaintiff did not assert any independent claims of negligence or other conduct[2] aside from that deriving from Cincinnati.

In the trial court, defendants filed a motion in limine to preclude evidence of any continuing duty. Although unclear, it appears that the trial judge tentatively denied the motion, but stated he would consider further objections when and if they arose. Although there were no objections to the opening and closing arguments, defendants ob-

---

[1] In a subsequent surgery, plaintiff had his big toe removed and attached to his hand.

[2] For example, failure to warn.

jected to postmanufacture evidence on relevancy grounds. In each case, the objection was overruled.

Thus, when plaintiff called Cincinnati's representative Dennis Cloutier as an adverse witness, plaintiff's counsel was permitted to introduce evidence of OSHA standards promulgated in 1971, which require employers to install guardings on press brakes. This led to the presentation of Cincinnati's two postmanufacture service calls and evidence that plaintiff's employer, years later, requested and received price quotes to update the machine to conform with the OSHA provisions.[3] Plaintiff also elicited evidence of electronic sensing devices developed for use in the United States *after* 1964[4] and was permitted to question Mr. Cloutier about Cincinnati's failure to recall the machine.

Plaintiff's only expert opined that if Cincinnati discovered after 1964 that the press brake was defective for not having adequate guarding, it "had a duty to correct that defect in the machine" and that, if it had, the accident would not have occurred. Furthermore, over defendants' objection, plaintiff admitted a photograph of a foot pedal guard despite the inability to identify any manufacturer having such a device in 1964.

At the conclusion of the evidence, Cincinnati moved for a directed verdict on the continuing duty instruction, contending that there is no basis in Michigan law for such instruction. The judge denied the motion and presented the question to the jury.

[3] Since 1964, Cincinnati sent approximately thirty mailings to SMI regarding updates available for the machine, including safety recommendations. The record indicates that this information was primarily introduced in response to the continuing duty theory.

[4] However, there was evidence that these devices were available in Scotland before 1964. Nonetheless, Dennis Cloutier explained that they were not developed or perfected until 1970. When fully developed, Cincinnati forwarded this information to SMI.

Against Cincinnati, the jury was instructed on a standard negligent design theory. However, it was further instructed that a manufacturer has a duty to incorporate new advances in technology and that "a manufacturer who learns of a design defect after the product has been sold has a duty to take reasonable actions to correct the defect. It is for you to determine what constitutes reasonable actions." On the verdict form, the jury was further instructed to answer whether Cincinnati was "negligent in one or more of the ways claimed by the plaintiff." These "ways" to find negligence were either negligent design or some form of continuing negligence, i.e., repair or recall. Against the seller Addy-Morand, the jury was instructed in accordance with the implied warranty theory only. The jury found both defendants liable and returned a verdict for plaintiff in the amount of $1 million.[5]

The Court of Appeals reversed and remanded, finding that Michigan law does not impose on manufacturers a duty to repair or recall a product after its release into the stream of commerce. 202 Mich App 474; 509 NW2d 809 (1993). Reviewing *Comstock v General Motors Corp*, 358 Mich 163; 99 NW2d 627 (1959), the Court held that a manufacturer has the duty to warn of a latent defect, but does not have a duty to repair a latent defect. The Court found that admission of this theory of liability and its accompanying evidence resulted in error requiring reversal because the jury may have found Cincinnati

> liable on the basis of their failure to take affirmative steps to alleviate the risk of injury after the machine had been sold, notwithstanding the possibility that the product may not have been "defec-

---

[5] The jury actually awarded plaintiff $1.5 million but, because of his contributory negligence, reduced the award to $1 million.

tive" when the machine was designed and sold according to those standards extant in 1964. [202 Mich App 484-485.]

With regard to the distributor Addy-Morand, the Court found that the same erroneous instruction tainted evidence of a point-of-manufacture defect because the warranty claim against Addy-Morand was derivative of the design defect, i.e., there was no independent evidence of negligence or breach of warranty by Addy-Morand. Judge MURPHY dissented, finding no error in the instruction or theory of products liability. We granted plaintiff's application for leave to appeal.[6]

II

The central problem in a negligent design case in admitting postmanufacture evidence or imposing a postmanufacture duty to repair or recall is the possibility of taint or jury confusion with respect to any finding of negligence at the time of manufacture. Generally, before there can be any continuing duty—whether it be to warn, repair, or recall—there must be a defect or an actionable problem at the point of manufacture. If there is no defect or actionable problem at this point, then there can be no continuing duty to warn, repair, or recall. Hence, when that distinction is not clearly presented, the potential for jury confusion is great, as well as the possibility of holding a manufacturer liable for postmanufacture improvements, which, as explained below, is contrary to Michigan law.

Moreover, in the usual case in which an issue of latency is not presented, the existence of a point-of-manufacture defect or other actionable problem

[6] 447 Mich 980 (1994).

entitles a plaintiff to full recovery if proven by a preponderance of the evidence. Hence, the need for presenting a continuing duty theory with its accompanying evidence in this situation is nil, while the possibility for jury taint or confusion is high. In order to fully understand these principles, a review of the various theories of negligent design is necessary.

In Michigan, there are two theories that will support a finding of negligent design.[7] The first theory is based on a failure to warn. This theory renders the product defective even if the design chosen does not render the product defective. See *Gerkin v Brown & Sehler Co,* 177 Mich 45, 57-58; 143 NW 48 (1913); *Comstock, supra;* American Law of Products Liability, 3d, § 32:2, pp 17-19. This warning includes the duty to warn about dangers regarding the intended uses of the product, as well as foreseeable misuses. *Antcliff v State Employees Credit Union,* 414 Mich 624, 637-638; 327 NW2d 814 (1982). If, however, the manufacturer is not aware of the defect until after manufacture or sale, it has a duty to warn upon learning of the defect; if there exists a point-of-manufacture duty to warn, a postmanufacture duty to warn necessarily continues upon learning of the defect. *Comstock, supra;* Products Liability, *supra* at § 32:79, p 130.

The other, more traditional means of proving negligent design questions whether the design chosen renders the product defective, i.e., whether a risk-utility analysis favored an available safer alternative. *Prentis v Yale Mfg Co,* 421 Mich 670; 365 NW2d 176 (1984). In such a complaint, the focus of any duty begins with whether the product

---

[7] Although not a design defect, at least one other product defect is recognized in Michigan. A manufacturer will be held liable for manufacturing defects existing at the time of manufacture and sale.

was defective when it left the manufacturer's control. *Holloway v General Motors Corp (On Rehearing)*, 403 Mich 614, 621; 271 NW2d 777 (1978).

Against Cincinnati, plaintiff alleged that the press brake was defectively designed in the traditional sense under a breach of warranty and negligence theory. *Plaintiff did not allege negligent design under a failure to warn theory.* Generally, breach of warranty and negligence are separate and distinct theories. *Smith v E R Squibb & Sons,* 405 Mich 79, 89-91; 273 NW2d 476 (1979). A breach of warranty claim tests the fitness of the product and requires that the plaintiff "prove a defect attributable to the manufacturer and causal connection between that defect and the injury or damage of which he complains." *Piercefield v Remington Arms Co,* 375 Mich 85, 98-99; 133 NW2d 129 (1965). Customarily, this defect can be found "regardless of the amount of care utilized by the manufacturer." *Squibb, supra* at 89. On the other hand, a negligence claim tests the defendant's conduct instead of the product to determine whether it was reasonable under the circumstances. *Id.*[8]

At times, these two distinct theories merge into one, i.e., the dispositive inquiry is one in the same.[9] In *Prentis, supra,* this Court held that a

---

[8] [T]he negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable, while warranty generally focuses upon the fitness of the product, irrespective of the defendant's conduct. [*Prentis, supra* at 692.]

[9] In *Squibb, supra* at 88, this Court discussed the effect of a breach of warranty and negligence claim against a manufacturer for inadequate warnings. We held that both claims "involve identical evidence and require proof of exactly the same elements," i.e., "reasonable care under the circumstances." *Id.* at 90. "This is true because the focus is upon the *adequacy* of the warnings, regardless of the theory of liability." *Id.* (emphasis added). It is "not whether the product itself is defective . . . ." *Id.* at 89.

traditional design defect case requires a negligence analysis even if the claim alleges a separate count of warranty. Unlike other product cases, the dispositive focus is on the manufacturer's conduct, not just the product. *Id.* at 688. A conscious *decision* to design a product in a certain manner necessitates that the focus be on conduct rather than the product.[10] Hence, the trier of fact must employ a risk-utility balancing test that considers alternative safer designs and the accompanying risk pared against the risk and utility of the design chosen "to determine whether . . . the manufacturer exercised reasonable care in making the design choices it made."[11] *Id.* Such an inquiry requires plaintiff to prove "that the manufacturer knew or should have known of the design's propensity for harm." 1 Madden, Products Liability (2d ed), § 8.1, p 290. In this context, the manufacturer's conduct is then tested for reasonableness. *Id.* at 291.

---

[10] Manufacturing defects, however, are different because it necessitates examination of the product itself rather than the manufacturer's conduct. Hence, "[i]n the case of a 'manufacturing defect,' the product may be evaluated against the manufacturer's own production standards, as manifested by that manufacturer's other like products." *Prentis, supra* at 683.

[11] In this case, the alleged defect is the lack of safety devices, specifically, guarding at the point of operation and on the foot pedal. As our Court of Appeals explained in *Reeves v Cincinnati, Inc,* 176 Mich App 181, 187-188; 439 NW2d 326 (1989),

> a prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of foreseeable risks, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident. It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger. This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product.

III

In this case, defendants do not allege error with regard to the standard negligence or breach of warranty theories against either the manufacturer or the seller. Instead, they maintain a claim of error on the presentation of the theory to repair, recall, or, in some manner, prevent the accident. Such a focus clearly questions the *conduct* of the manufacturer rather than the condition of the product itself. Moreover, it is a postmanufacture duty to cure after the product leaves its control. Because any duty imposed is one of public policy and depends on the facts of the individual case, the question of imposing such a duty is one of law.[12]

A

Commentators and courts have found postmanufacture or continuing duties to arise in a variety of circumstances depending on the type of danger posed, the manufacturer's knowledge, and the time in which the manufacturer knew, should have known, or actually learned of a possible problem.[13] Generally, however, these factors must exist while the product is in the control of the manufacturer. For example, a danger must exist at the point of manufacture and the manufacturer either must have known or should have known of the problem while still in its control.[14] This is most appropriately deemed a postmanufacture duty stemming from a defect at the *point of manufacture.*

[12] See *Glittenberg v Doughboy Recreational Industries (On Rehearing),* 441 Mich 379, 386; 491 NW2d 208 (1992); *Antcliff, supra* at 631.

[13] See, generally, Allee, *Post-sale obligations of product manufacturers,* 12 Fordham Urb L J 625, 630-638 (1984).

[14] See comment, *Manufacturers' post-sale duties in Texas—Do they or should they exist?,* 17 St Mary's L J 965, 967, 987 (1986).

Over the years, however, these postmanufacture duties have been extended beyond the underlying premise of a point-of-manufacture defect to situations in which the product was *not* legally defective at the time of release, but "defective" because of improvements in technology, imposing on the manufacturer a duty to notify purchasers or incorporate the improvements into products already on the market. In such a case, the problem is unconnected to a defect that existed under the state of the art at the time of manufacture.[15] Accordingly, this duty logically cannot be deemed a continuing duty because there would be nothing to continue if the product left the manufacturer's control in a nondefective condition.[16]

In this appeal, plaintiff insists that the issue before this Court only concerns the former, i.e., a continuing duty stemming from a defect existing at the point of manufacture. Defendants and its amici curiae contend that the issue is not so clear, with evidence in the record that both theories were presented, that both were error, and, accordingly, require reversal because they tainted any finding of negligence under traditional theories of products liability.

At this point in our analysis, we deem it necessary to clarify whether the instant postmanufacture duty was premised on a point-of-manufacture defect or a postmanufacture improvement in technology that now makes the product dangerous or defective. Reviewing the testimony, jury instruc-

---

[15] See, generally, note, *Manufacturers of inherently dangerous products: Should they have a continuing duty to make their previously sold products conform to state of the art safety features?*, 92 W Va L R 153 (1989).

[16] *Lynch v McStome & Lincoln Plaza Associates,* 378 Pa Super 430, 440-441; 548 A2d 1276 (1988); *Jackson v New Jersey Manufacturers Ins Co,* 166 NJ Super 448, 464-466, and n 3; 400 A2d 81 (1979); *Noel v United Aircraft Corp,* 342 F2d 232, 242-244 (CA 3, 1964) (opinions of Freedman and Biggs, JJ.).

tions, and the ruling on the motion for directed verdict, we are persuaded that both theories were presented. The relevant instructions on this issue came after a proper explanation of the implied warranty claim against the seller and the negligent design claim against Cincinnati. Immediately following the instruction of negligent design against Cincinnati, the trial judge indicated:

> A manufacturer has a further duty to deep [sic] abreast of and be informed of the developments in the field of safety, design and manufacture and to reasonably incorporate new advances in safety technology into the design and manufacturer [sic] of its product. There is no obligation on the part of the manufacturer to provide every possible new device which might possibly have been conceived or invented.
>
> Further, a manufacturer who learns of a design defect after the product has been sold has a duty to take reasonable actions to correct the defect. It is for you to determine what constitutes reasonable actions.

These instructions did not emphasize that the design defect initially must have existed in 1964 or that the "further duty to [k]eep abreast of . . . developments" was confined to time of manufacture and not thereafter. Moreover, a further instruction presented orally and on the verdict form directed the jury to answer whether Cincinnati was "negligent in one or more of the ways claimed by the plaintiff."

Likewise, it is not clear that the trial judge deemed this theory applicable merely on the basis of a defect at the time of manufacture. He denied defendants' motion for a directed verdict on this theory because "[e]vidence was introduced to point

out that safety standards were changed by law at some point after the machine left the manufacturer and before the accident involved in this case, and that's one of the factors that might lead a reasonable trier of fact to determine that there was continuing duty of some sort."[17]

Considering all instructions and the trial court's ruling, we believe both theories were logically presented and thus discussion of both is required to determine their effect on this verdict.

B

In Michigan to date, the only postmanufacture duty imposed on a manufacturer has been the duty to *warn* when the defect existed at the point of manufacture, but for some reason was undiscoverable by both the manufacturer[18] and the con-

---

[17] He further stated:

There has also be [sic] evidence submitted, mostly by the defendant, that would indicate that the defendant apparently felt some duty to inform owners of its machines that laws had changed and technology had changed and that it was prepared to offer a price and a procedure for making those changes. And all of those things I believe add up to enough to present that question of fact to the trier of fact.

Justice CAVANAGH's opinion admits that this theory was error, but dismisses its relevancy with respect to the error in this case because the judge's statement, as it obviously would in a motion for directed verdict, was made *"out of the presence of the jury." Post* at 47. Interesting as this observation of the trial court's ruling may be, it is meaningless when considering plaintiff's proofs and argument coupled with the actual instructions given to the jury.

[18] We emphasize that we are not presented with and do not decide whether manufacturers of distinct products have a continuing duty to warn consumers or learned intermediaries of dangers discovered after the product enters the market. See, e.g., *Baker v St Agnes Hosp,* 70 AD2d 400; 421 NYS2d 81 (1979) (a drug manufacturer must keep abreast of knowledge of its products gained through research and other means and must take reasonably necessary steps to bring that knowledge to the attention of the medical profession).

sumer[19] at that time. *Comstock, supra.* However, we have never held that a manufacturer has a postmanufacture duty to repair or recall in this context, and have never held that any postmanufacture duties can arise from subsequently discovered knowledge unattributable to a defect at the time of manufacture.

In the seminal case, this Court in *Comstock* held that a manufacturer has a postmanufacture duty to warn of latent defects once the manufacturer discovers the problem. There, while the defect was not apparent either to the manufacturer or the consumer at the time of sale, a defect nonetheless existed and manifested itself post manufacture. When the defect was discovered, the defendant, General Motors, acknowledged its existence by offering to repair the defect free of charge.[20]

In the unique context in which the manufacturer acknowledged the existence of a *latent manufacturing* defect, as evidenced by numerous failures and the offer to repair, the Court imposed a duty to warn. *Id.* at 175-176. It was apparent that

---

[19] Plaintiff also relies on *Gerkin, supra.* At issue in *Gerkin* was the failure to warn consumers with a point-of-manufacture or sale notice that a hidden, dangerous condition might adversely affect certain people. Such a holding is well established in law and is not at issue in this case. We imposed a duty to warn of a dangerous condition because a manufacturer has superior knowledge of a dangerous condition present at the time of sale. If the knowledge is not apparent to consumers, a manufacturer will be held liable for failure to attach a point-of-manufacture warning to the product. *Id.* at 57. Accord *Matthews v Lawnlite Co,* 88 So 2d 299 (Fla, 1956). See also Noel, *Manufacturer's negligence of design or directions for use of a product,* 71 Yale L J 816, 820-822 (1962). However, this by no means is a postmanufacture duty.

[20] In *Comstock,* the plaintiff was injured when a co-worker attempted to move a car that had lost all brake function. This brake failure was attributed to a manufacturing defect in a sealer that allowed brake fluid to escape, thereby causing brake loss. At the time of manufacture, General Motors allegedly did not know of the defect or its possible failure. Shortly after sale, however, it learned of numerous failures attributed to defective sealers and thus directed its dealers to repair the brakes at no cost to the consumer.

this subsequently discovered knowledge and increase of the risk of serious injury required some attempt to prevent the accident. Reasoning that "[i]f such duty to warn of a known danger exists at point of sale, . . . a like duty to give prompt warning exists when a *latent defect* which makes the *product hazardous to life becomes known* to the manufacturer *shortly after the product* has been put on the market." *Id.* at 177-178 (emphasis added).

Since *Comstock,* one federal district court in Michigan has rejected extending a duty to warn of a defect to include a duty to repair or recall. *Eschenburg v Navistar Int'l Transportation Corp,* 829 F Supp 210, 214-215 (ED Mich, 1993). More-over, another district court rejected the contention that a manufacturer has a duty to notify consumers of postmanufacture safety advances when there is no allegation or proof of a defect existing at the time of manufacture. *Zettle v Handy Mfg Co,* 837 F Supp 222, 224 (ED Mich, 1992), aff'd on other grounds 998 F2d 358 (CA 6, 1993).[21] Relying on the Court of Appeals decision in this case, another panel of the Court of Appeals recently rejected a similar argument to update purchasers regarding advances in technology when the product itself was not defective. *Reeves v Cincinnati, Inc (After Remand),* 208 Mich App 556, 561; 528 NW2d 787 (1995).

C

In this case, plaintiff does not allege that the press brake should have had a point-of-manufacture warning attached to it, nor does he contend

---

[21] The plaintiff in *Zettle* conceded that "manufacturers have no duty to retrofit their products with safety devices that become available after the date of manufacture." *Id.* at 224.

that Cincinnati breached the duty to warn of a latent defect in accordance with *Comstock.* Instead, he maintains that Cincinnati had a duty to repair, fix, or recall the product, reasoning that, if a duty to warn exists under *Comstock,* a duty to repair also must exist. We disagree.

We find *Comstock* substantially different from this case because *Comstock* premised the post-manufacture duty to warn on the basis of latency. In the case at bar, *plaintiff did not allege that the defect was latent,*[22] but instead contended that Cincinnati knew or should have known of the dangerous condition of this product absent certain safety devices. We are persuaded that resolution of this risk-utility test (knew or should have known) forecloses consideration of a latent defect discovered post manufacture. If the manufacturer should have known of the problem, liability attaches at that point, not post manufacture.[23]

[22] To support a claim of latency, the plaintiff usually must make "an initial showing that the manufacturer acquired knowledge of a defect present but unknown and unforeseeable at the point of sale and failed to take reasonable action to warn of the defect." See *Patton v Hutchinson Wil-Rich Mfg Co,* 253 Kan 741, 761; 861 P2d 1299 (1993); see also *Comstock, supra.*

We find it interesting that the testimony revealed only one statement regarding latency, with no factual connection to the reality of the situation. Plaintiff's expert, Dr. Youngdahl, stated:

In my opinion if Cincinnati had not discovered the hazard and risk of injury in 1964, and thus didn't provide any point of operation protection and then discovered that hazard and risk at some later time, in my opinion they had a duty to correct that defect in the machine.

The term latent is defined as "present but not visible, apparent, or actualized; existing as potential . . . ." *Random House Webster's College Dictionary,* p 1086.

[23] Although plaintiff's expert opined that if Cincinnati discovered the defect post manufacture, it had a duty to repair the problem; the proofs, theories, and defenses belie such a finding. Cincinnati knew of safety features such as dual-palm buttons and offered a similar machine for sale to SMI. It simply determined that this risk utility of this general purpose press brake favored a machine with these

In *Prentis,* we held that design defect cases require a risk-utility balancing test. *Id.* at 684, 691. With the focus on conduct rather than simply the product, proof of a defect by the risk-utility test resolves any issue of latency because the result of the test is a finding that the manufacturer either knew or should have known of the danger at the point of manufacture. Accordingly, a design defect cannot, practically speaking, be deemed undiscoverable at the point of manufacture. In other words, constructive knowledge imputed to the manufacturer under the state of the art at the time of design renders the concept of latency at issue in *Comstock* moot in a design defect case.[24] There

additional guardings. Essentially, defendants contended that the size of the metal being shaped in the instant machine prevents any point of operation guarding in part because the guarding itself would obstruct the workpiece, but also because the size of the workpiece often required the operator to hold it with one hand. In light of this, the premise of *Comstock* is inapposite in this case; unlike *Comstock,* there is no issue of latency.

[24] One commentator has subdivided design defects into two categories at opposite ends of the spectrum: (1) inadvertent design errors, and (2) conscious design choices. Henderson, *Judicial review of manufacturers' conscious design choices: The limits of adjudication,* 73 Colum L R 1531, 1547-1550 (1973).

At one end of the spectrum are risks of harm which originate in the inadvertent failure of the design engineer to appreciate adequately the implications of the various elements of his design, or to employ commonly understood and universally accepted engineering techniques to achieve the ends intended with regard to the product. At the other end of the spectrum are risks of harm which originate in the conscious decision of the design engineer to accept the risks associated with the intended design in exchange for increased benefits or reduced costs which the designer believes justify conscious acceptance of the risks. In cases involving liability for inadvertent design errors, the means employed to reach the intended ends are insufficient: in cases involving liability for conscious design choices, the intended ends themselves are out of step with prevailing social policies. [*Id.* at 1548.]

In the context of Michigan law, we regard Professor Henderson's characterization of inadvertent errors as things the manufacturer "should have known" at the time of manufacture, see *id.* at 1550,

being no issue of latency, the question becomes whether any postmanufacture duty is imposed.[25]

D

Because a prima facie case is established once the risk-utility test is proven, we are persuaded that it is unnecessary and unwise to impose or introduce an additional duty to retrofit or recall a product. *Patton v Hutchinson Wil-Rich Mfg Co,* 253 Kan 741, 763-764; 861 P2d 1299 (1993).[26] Focusing on postmanufacture conduct in a negligent design case improperly shifts the focus from point-of-manufacture conduct and considers postmanufacture conduct and technology that accordingly have the potential to taint a jury's verdict regarding a defect.[27]

Moreover, we believe the duty to repair or recall is more properly a consideration for administrative agencies[28] and the Legislature who "are better able to weigh the benefits and costs involved in locating, recalling, and retrofitting products," as well as other economic factors affecting businesses and consumers.[29] *Patton, supra* at

whereas the conscious design choice is a danger that the manufacturer knew, but that the risk utility favored the design chosen. *Id.* at 1553.

[25] Because latency is not at issue in this case, the premise recognized in *Comstock* for imposing a duty to warn is lacking. Therefore, we need not consider, and save for another day, whether *Comstock* should be extended to include a duty to repair or recall in other product suits.

[26] See also *Wallace v Dorsey Trailers Southeast, Inc,* 849 F2d 341 (CA 8, 1988).

[27] See note, *The manufacturer's duty to notify of subsequent safety improvements,* 33 Stan L R 1087, n 2 (1981).

[28] See also *Smith v Firestone Tire & Rubber Co,* 755 F2d 129, 135 (CA 8, 1985).

[29] Like the plaintiff in *Patton,* plaintiff relies on Restatement Torts, 2d, § 321, p 132:

If the actor does an act, and subsequently realizes or should

764.[30] Courts have traditionally not been suited to consider the economic effect of such repair or recall campaigns. In this case, with liability premised on the risk-utility test, a continuing duty instruction adds nothing to plaintiff's case but potential confusion.[31]

In any event, when appropriate, i.e., when the protection of vital interests was deemed necessary, policymakers have explicitly delegated such au-

realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

Plaintiff has not cited any case wherein a Michigan court has adopted this provision and has not demonstrated that such a duty was intended to apply to products liability actions (independent research has revealed none). However, as the *Patton* court found, this does not change our belief that a duty to recall is appropriately left to administrative agencies and the Legislature.

[30] [C]ourts that impose a post-sale obligation to remedy or replace products already in the marketplace arrogate to themselves a power equivalent to that of requiring product recall. Product recalls, however, are properly the province of administrative agencies, as the federal statutes that expressly delegate recall authority to various agencies suggest. As Congress has recognized, administrative agencies have the institutional resources to make fully informed assessments of the marginal benefits of recalling a specific product. Because the cost of locating, recalling, and replacing mass-marketed products can be enormous and will likely be passed on to consumers in the form of higher prices, the recall power should not be exercised without extensive consideration of its economic impact. Courts, however, are constituted to define individual cases, and their inquiries are confined to the particular facts and arguments in the cases before them. Decisions to expand a manufacturer's post-sale duty beyond making reasonable efforts to warn product users about newly discovered dangers should be left to administrative agencies, which are better able to weigh the costs and benefits of such action. [Schwartz, *The post-sale duty to warn: Two unfortunate forks in the road to a reasonable doctrine*, 58 NYU L R 892, 901 (1983).]

[31] Perhaps proof of such conduct would be relevant and necessary if punitive damages were available in Michigan, but that is not the case. See *Reed v Ford Motor Co*, 679 F Supp 873 (SD Ind, 1988), in which the court approved a recall theory in order to prove recklessness for purposes of punitive damages only.

thority to administrative agencies.[32] Plaintiff did not rely on and cites no statute imposing such a duty to repair or recall so as to provide a basis for a legal duty in a negligence action. If he had, and in the appropriate case, failure to follow a recall order mandated by statute and agency might provide the basis for a duty to recall in a negligence action.

Cases that have imposed a duty to repair or recall have been few and have primarily been reserved for extraordinary cases,[33] i.e., airplane safety,[34] in which the potential danger is severe

[32] See Consumer Product Safety Act, 15 USC 2064 (Consumer Product Safety Commission); National Traffic and Motor Vehicle Safety Act, 15 USC 1414 (now repealed) (Secretary of Transportation); The Food, Drug, and Cosmetic Act, 21 USC 360ll (Secretary of Health and Human Services); 21 USC 360h (Secretary of Health and Human Services).

[33] In *Kociemba v G D Searle & Co,* 707 F Supp 1517, 1528 (D Minn, 1989), the court suggested that a product recall may be available in "special cases" in which the manufacturer had "knowledge of a problem with the product, continued sale or advertising of the product, and [had] a pre-existing duty to warn of dangers associated with the product." Unlike the instant case, the product in *Kociemba* was an intrauterine contraceptive device that allegedly caused the plaintiff to become infertile. In that context, in which the manufacturer knew of the defect but continued to sell the product, the court found the necessary "special circumstance" for imposition of a postmanufacture duty to warn or recall.

[34] See *Noel v United Aircraft Corp,* n 16 *supra* (arguably holding that in context of an airline crash, there is a duty to improve the product when human safety is at issue). Following the central theme of *Noel,* but explicitly refusing to adopt *Noel,* the United States Court of Appeals for the Third Circuit in *Braniff Airways, Inc v Curtiss-Wright Corp,* 411 F2d 451, 453 (CA 2, 1969), held without citation:

It is clear that after such a product has been sold and dangerous defects in design have come to the manufacturer's attention, the manufacturer has a duty either to remedy these or, if complete remedy is not feasible, at least to give users adequate warnings and instructions concerning methods for minimizing the danger.

See also *Bell Helicopter Co v Bradshaw,* 594 SW2d 519 (Tex Civ App, 1979) (discussed below); *Downing v Overhead Door Corp,* 707 P2d 1027 (Colo App, 1985); *Romero v Int'l Harvester Co,* 979 F2d 1444 (CA 10, 1992).

and widespread. We elect not to follow such precedent in the instant case. Indeed, other courts have been unwilling to impose such an onerous duty except where there is an assumption of the duty or some special, controlling relationship between the manufacturer and the owner of the machine.

E

Plaintiff maintains that Cincinnati assumed such a continuing duty to act reasonably and modify the product on the basis of its postmanufacture relationship with plaintiff's employer. He bases this on two service calls to repair the machine. However, even if we recognized this theory of liability, we do not discern this necessary assumption or controlling relationship.

In *Noel v United Aircraft Corp,* 342 F2d 232, 241 (CA 3, 1964), the court found a duty to repair or recall on the basis of a continuing relationship between the defendant and the operator of the aircraft.[35] The agreement between the parties required the defendant to examine the aircraft "as it now stands" to determine whether a catastrophic result was possible. This relationship, the court held, indicated that the manufacturer *assumed* this postmanufacture obligation and accordingly could be found negligent for breach of it.[36]

In *W M Bashlin Co v Smith,* 277 Ark 406, 411; 643 SW2d 526 (1983), the Arkansas Supreme Court intimated that such a duty to recall may exist in other contexts such as a "body belt" used to secure a person working on power lines located high above ground.

[35] We note that the court arguably held that such a duty existed because a defect existed at the time of manufacture and posed a significant risk to human life regardless of any controlling relationship. However, the opinion on rehearing demonstrated dissatisfaction with that ground alone and thus explicitly relied on this continuing relationship.

[36] See note, *Products liability—Post-sale duty to cure dangerous defect,* 40 Tulane L R 436, 440-441 (1966); *O'Keefe v Boeing Co,* 335 F Supp 1104, 1130 (SD NY, 1971).

Since *Noel,* other jurisdictions have adopted a similar continuing duty on the basis of a unique postmanufacture relationship between the manufacturer and the owner of the product.[37] For example, in *Bell Helicopter Co v Bradshaw,* 594 SW2d 519 (Tex Civ App, 1979), the defendant manufactured a helicopter with state of the art tail rotor blades in 1961. In 1968, however, the defendant decided to update the blades to improve safety. An accident occurred in 1975 because of the failure of these originally manufactured blades. Realizing that the product must have been defective when it left the hands of the manufacturer and that the product was not defective in 1961, the court based its finding of postmanufacture negligence on a relationship between the defendant and its authorized service station. The court held, as a matter of law, that the service station had *control* of the helicopter after the sale and after development of the improved tail rotor system, and, accordingly, *assumed* the duty to remedy the product:[38]

> [W]here the record reflects, as in this case, an apparent assumption of such a duty by a manufacturer, it is not wholly improper for us to measure its conduct against such duty with respect to plaintiff's allegations of post-manufacture negligence. Here, [the defendant] assumed the duty to improve upon the safety of its helicopter by replacing the 102 system with the 117 system. Once the duty was assumed, [the defendant] had an obligation to complete the remedy by using reasonable means available to it to cause replacement of 102 systems with 117 systems. [*Id.* at 532.]

In this case, we are not persuaded that plaintiff

---

[37] See note, *Efficient accident prevention as a continuing obligation: The duty to recall defective products,* 42 Stan L R 103, 110-111 (1989).

[38] *Id.* at 531-532.

proved a continuing relationship sufficient to impose such a duty.[39] There were only two postmanufacture service calls, one in 1967 and one in 1973. These calls were effected by service technicians, not safety representatives or salespersons; Cincinnati was simply asked to repair this machine, not to provide a safety evaluation. *Shapiro v Remington Arms Co,* 259 F2d 760, 761 (CA 7, 1958). Moreover, Cincinnati never voluntarily assumed a duty as the manufacturers did in *Noel* and *Bradshaw* and certainly did not regain control of the machine.[40] Although Cincinnati forwarded nearly thirty mailings documenting various safety options, this does not create such a unique or controlling relationship as to justify a duty to repair or recall the product. These mailings presumably were regularly sent out to all Cincinnati customers. When asked by plaintiff's employer to provide quotations for updates in accordance with the 1970 OSHA law, Cincinnati provided this information.

---

[39] In any event, the trial judge did *not* premise his ruling on any ongoing relationship between Cincinnati and plaintiff's employer. Instead, the judge premised the continuing duty on the basis that "[e]vidence was introduced to point out that safety standards were changed by law at some point after the machine left the manufacturer and before the accident involved in this case, and that's one of the factors that might lead a reasonable trier of fact to determine that there was continuing duty of some sort."

We further agree with the Court of Appeals analysis of the trial court's ruling:

[T]he court's response to defendants' motion for a directed verdict in regard to the continuing-duty theory was not responsive to the concern raised by the motion. Defendants moved for a directed verdict arguing that the theory of continuing duty was not a *legally* sufficient ground for imposition of liability. Thus, when the trial court responded by concluding that there was sufficient evidence presented to allow the jury to conclude that defendants breached that duty, the court was overlooking the possibility that the theory was not one recognized in law, regardless of the amount of evidentiary support that may have existed on the record. [202 Mich App 483.]

[40] See *Dion v Ford Motor Co,* 804 SW2d 302, 310 (Tex App, 1991).

Once again, however, this did nothing to create a controlling relationship.

Accordingly, on these facts, there was insufficient proof that Cincinnati assumed a duty to repair or recall the press brake because of some special, controlling relationship with SMI. In the twenty years that SMI used the press, only two service calls were performed, there were several regular mailings, and there was one request for price quotations. This does not create any unique or controlling relationship so as to provide the impetus for a continuing duty instruction. Accord *Syrie v Knoll Int'l,* 748 F2d 304, 311 (CA 5, 1984).

IV

We turn next to consideration of a duty to repair or recall when postmanufacture advances render the product as originally released obsolete or unreasonably dangerous under today's technology.

Generally, a manufacturer is under no duty to modify its product in accordance with the current state of the art safety features. Note, *The manufacturer's duty to notify of subsequent safety improvements,* 33 Stan L R 1087, n 2 (1981); *Reeves, supra* at 561.[41] This is because "[a] duty to modify is incompatible with a rule making liability turn exclusively on whether the product meets the state of the art at the time of production." 33 Stan L R

[41] See also *Syrie, supra* at 311-312; *Shapiro, supra.* But see *Ellis v H S Finke, Inc,* 278 F2d 54 (CA 6, 1960) (applying Tennessee law, the court in dicta suggested that there would be a duty to modify a product); Noel, *Manufacturer's negligence,* n 19 *supra* at 826 ("It would seem that where a safety device can be easily attached and will remedy a real danger, there should be a duty to take reasonable steps to supply the safety device even to those to whom the product already has been sold"); *Lanclos v Rockwell Int'l Corp,* 470 So 2d 924, 930-931 (La App, 1985) ("continuing duty to provide safety devices as they become available").

1087, n 2. This Court previously declined making liability turn on the state of the art at the time of trial in *Prentis, supra.* We rejected Dean Keeton's approach, which would weigh the risk and utility of the product at the time of trial, in favor of Professor Wade's position, which imposed the risk-utility balancing at the time of manufacture or sale. *Prentis, supra* at 699-700.

More importantly, however, imposing a duty to update technology would place an unreasonable burden on manufacturers. It would discourage manufacturers from developing new designs if this could form the bases for suits or result in costly repair and recall campaigns.[42]

In light of the traditional focus of Michigan products liability law and the onerous effect on manufacturers, we decline to recognize such a duty.

V

In light of the foregoing, we review whether the error in this case requires reversal. We note at the outset that there was some proof offered of negligent design as of 1964. The only question is whether, as defendants contend, the continuing

---

[42] See *Lynch,* n 16 *supra* at 440-441.

The imposition of post-sale tort law obligations that include the duty to remedy or replace products already in the marketplace has significant implications. Attorneys who counsel manufacturers about how to fulfill their obligations and avoid liability must inform them that by developing new and safer products they may be exposed to liability for harm caused by an older product made and sold before the safety improvements were developed. This advice may discourage the very conduct society seeks to foster. Progress and innovation should not be penalized by attaching to them a duty to go out into the marketplace to find and fix old products. [Schwartz, *The post-sale duty to warn,* n 30 *supra* at 900-901.]

duty theory and its accompanying evidence tainted this otherwise permissible finding of negligence. We hold that it did.[43]

_____

[43] Justice CAVANAGH contends that the postmanufacture evidence was invited, "unpreserved or harmless" and a part of the defense "trial strategy." *Post* at 37, 39. This disingenuous characterization is belied by the record and Justice CAVANAGH's own opinion. Cincinnati made a pretrial motion in limine, objected to evidence introduced at trial, and moved for a directed verdict on this ground. These facts are not indications of invitation or waiver. Moreover, if the claim was invited, defense counsel would not have made the following remarks in his opening statement regarding postmanufacture evidence:

> I am not sure on some things that may come into this case. Mr. Eaton referred to some things that be [sic] recalls that perhaps the defendant after 1964 should have recalled or done something further. I am not sure exactly what evidence will come into the case but if it does, there is a little bit different focus. As the case is presently framed you are going to be asked to judge whether the machine was defective in 1964, that is whether it's unreasonably dangerous, was it safe to operate.
>
> If we get into this post '64, if that turns out to be the case, that's up until the date of the accident which I said was '86, then no longer is the focus on the machine and whether it was dangerous or whether it was safe, but now the focus will be the actions of Cincinnati Incorporated and whether their actions were negligent or not; completely different focus. So if we get into this area, '64 to '86, our proposition to you and our suggestion to you will be we acted reasonably and we acted prudently. The risk of injury to someone like Mr. Gregory didn't change from '84 [sic] to '86, it remained the same. We are going to say that other manufacturers did nothing different than our manufacturers, nor did we refer to any codes that were referred to. In fact, what you may find, if it comes into the case, is between those two dates is Cincinnati offered to this company dual palm buttons. We believe—I am not sure if it will come in or not so my words [sic] you will have to check at the end of the case whether this comes in or not—in about 1978 this company asked about an update and they asked asked [sic] us about dual paul [sic] buttons. And this company, this man's employer, eight months before the accident, we gave them a quotation; the quotation included dual palm buttons to take this machine from the operation of their foot pedal now to the operation of two buttons and they declined, though they chose to buy from us originally apparently.

When reaching the proofs stage of the trial, defense counsel objected in many instances, but was consistently overruled. Defendant then shifted focus to show that it acted reasonably post manufacture. Justice CAVANAGH's opinion simply disregards this portion of the record. Indeed, his selective citation from defense witness Donald

In the opening statement, plaintiff's counsel emphasized that Cincinnati "had a duty to fix the machine," relying in part on OSHA standards in 1971 requiring employers to install guardings. Counsel then introduced this evidence in the cross-examination of Cincinnati's representative (called as an adverse witness). Plaintiff also elicited testimony about the use of electronic sensing devices developed after 1964 (at least in the United States; they were apparently used in Scotland before 1964), and Cincinnati's postmanufacture service

Wandling disregards the nearly thirty recorded pages of testimony in which he explains why the press brake was not defective and why plaintiff's proof of a defect was misleading and inaccurate as applied to this particular machine. Justice CAVANAGH's citation, when given proper context, supports what defense counsel said might occur in opening statement, a shift in focus to respond to plaintiff's newly created product liability theory.

Contrary to Justice CAVANAGH's suggestion, the OSHA evidence was admitted over defendant's specific objection and presented by plaintiff, not defendant, in order to support the alleged duty to repair or recall. Plaintiff did this through its *second* witness Dennis Cloutier, who plaintiff called as an adverse witness. Plaintiff then used the OSHA standards to demonstrate negligence through its witnesses as well as with counsel's commentary on it in opening and closing arguments. (Plaintiff's opening statement: *"Then we come to the key point. After the government required this in the early '70's, made this a matter of law in the early '70's, the government placed a duty with respect to the employers, Cincinnati Machine did not in itself go back at this point and offer to fix the machines which. it knew or should have known were in fact were defective."* [Emphasis added.] Plaintiff's closing statement: "After it had been questionable, after government had mandated, after the MERK News had came out with new standards making it mandatory, again, did they do it? What did Cincinnati machines do? Did they go out and say we will help you pay for the cost of manufacturing these machines? No.") The inescapable premise of these statements and testimony is that the OSHA standards created or provided the basis for a duty to repair or recall the machine. This is far different from Cincinnati contending during its presentation that it did not breach its duty in 1964, but that Sheet Metal Industries breached its duty imposed by law, and thus was the *sole proximate cause* of plaintiff's injuries. Indeed, the fact that defendant *later* used these postmanufacture standards to shift the blame to Sheet Metal Industries is not surprising and, if believed, is consistent with Michigan law. In any event, defendant made specific objections and did not waive its right to appeal on this ground, as eventually conceded by Justice CAVANAGH's opinion when deeming the error "preserved." *Post* at 44.

calls resulting in quotations to plaintiff.'s employer to update the machine to comply with the 1971 OSHA law.[44] During questioning, defense counsel's objection on relevancy grounds was overruled. Plaintiff then elicited questions about Cincinnati's failure to recall the machine.

Furthermore, plaintiff's only expert opined that if Cincinnati discovered after 1964 that the press brake was defective for not having adequate guarding, it "had a duty to correct that defect in the machine," and that, if it had, the accident would not have occurred. In addition, over defendants' objection, plaintiff admitted a photograph of a foot pedal guarding despite the inability to identify any manufacturer having such a device in 1964.

In closing argument, plaintiff's counsel emphasized that Cincinnati had twenty-two years to fix the press brake and never did so. Plaintiff also contended that Cincinnati failed to act even after the 1971 OSHA law. Counsel concluded the continuing duty argument by noting that Cincinnati did nothing because it did not want to pay for it.

Hence, the evidence and argument of counsel indicates that repair and recall were primary issues for jury consideration. Indeed, the record logically contains contentions that Cincinnati had a duty to repair or recall on the basis of the 1971 OSHA law rather than negligent conduct at the time of manufacture. The evidence adduced after 1964 was irrelevant and prejudicial because it invited the jury to improperly focus on postmanufacture technology in assessing negligence. Hence, despite the evidence of a design defect based on

----

[44] Plaintiff contends that defendants introduced this evidence. We disagree. The record indicates that plaintiff's counsel elicited this on cross-examination of Dennis Cloutier who was called as an adverse witness.

pre-1964 evidence, the post-1964 evidence adduced because of the continuing duty theory clouded the jury's finding of liability. There is no indication in the record that defendants would have defended on grounds of reasonable conduct post manufacture absent plaintiff's assertion of a continuing duty.[45] It merely would have attacked the risk utility of its 1964 design choice on the merits and offered the defense of negligence on the part of plaintiff and SMI as the only legal causes of the accident.

Moreover, we find that the jury instructions further confused and tainted the jury's finding of liability.[46] After providing proper instruction regarding negligent design, the trial judge explained that the manufacturer has a further duty to incorporate new advances in technology into the prod-

[45] We do not address whether a manufacturer can relieve itself of liability by taking reasonable measures to prevent an accident or by the independent intervening event of a third party. See *Ford Motor Co v Wagoner,* 183 Tenn 392; 192 SW2d 840 (1946); *Balido v Improved Machinery, Inc,* 29 Cal App 3d 633, 649; 105 Cal Rptr 890 (1972); Noel, *Manufacturer's negligence,* n 19 *supra* at 870; 5 Harper, James & Gray, Torts (2d ed), § 28.7. We note, however, that these would be questions of fact for the jury. *Balido, supra* at 649; *Comstock, supra* at 179-180. Such an attack would question not a duty, but causation. This theory was simply not offered in this case.

[46] We agree with Justice CAVANAGH that defendant's proposed jury instructions possibly would have made the error with respect to Cincinnati harmless. Nevertheless, as stated earlier, we deem the introduction of the instant postmanufacture evidence and its accompanying duty to be error. This duty entails a weighing of various interests, all of which are more appropriately left to the Legislature or administrative agencies. We further emphasize that proof of a design defect at the point of manufacture, if believed, entitles a plaintiff to full recovery. A postmanufacture duty serves nothing but to confuse or taint this finding of negligence.

Justice CAVANAGH's contention that postmanufacture evidence relates to the standard of care is misguided. Under *Prentis,* the only relevant inquiry concerns the point-of-manufacture conduct, not the conduct after the product leaves the manufacturer's control. Only if a postmanufacture duty existed would this conduct be relevant to an issue in this case. We find that there is no postmanufacture duty in this case and, hence, no need for consideration of the standard of care to which Justice CAVANAGH alludes.

uct without any limitation or time frame, i.e., during the design phase. This was followed by an instruction that "a manufacturer who learns of a design defect after the product has been sold has a duty to take reasonable actions to correct the defect." Again, no time frame was provided, thereby inviting the jury to find liability on the basis of improvement in technology post manufacture. Further oral instructions and the verdict form asking the jury to determine whether Cincinnati was "negligent in one or more of the ways claimed by the plaintiff," i.e., repair or recall, confirm this possibility. Accordingly, Cincinnati is entitled to a new trial. There is simply no principled means to find these errors harmless.

VI

Against a seller who is not also the manufacturer, the claim is usually premised on an implied warranty theory. See *Prentis, supra* at 693; *Elsasser v American Motors Corp,* 81 Mich App 379, 384; 265 NW2d 339 (1978). This theory requires the plaintiff to prove that a defect existed at the time of sale, which is normally framed in terms of whether the product was "reasonably fit for its intended, anticipated or reasonably foreseeable use."[47] *Id.* However, like a claim against the manufacturer, a *design defect* still must exist at the point of sale.

Although plaintiff's claim in this case was one in warranty, we are persuaded that the extensive postmanufacture evidence tainted and influenced the jury's finding of liability, regardless of the instruction that restricted the jury's consideration to the time when the press left Addy-Morand's

---

[47] While many jurisdictions regard this as a strict liability theory, Madden, *supra,* § 8.8, p 317, this Court has not ruled on the issue. In this case, we express no opinion on this issue.

control.[48] Liability against a manufacturer is premised on a theory that a defect existed at the point of manufacture. On the other hand, liability against a seller hinges on a defect existing at the point of sale, which is a point later than the time of manufacture.[49] On the facts of this case, where there is no proof or mention of negligence against a seller, the only proof the jury could possibly review in order to find liability against the seller is the evidence offered against the manufacturer. However, as noted above, the extensive postmanufacture evidence tainted the finding of a defect against a manufacturer. On these facts, we find no reason to believe that the extensive postmanufacturing evidence did not also taint the seller's verdict, even assuming that the evidence against the manufacturer could establish liability against the seller. Contrary to the dissents' suggestions, the unique proofs and theories in this case obstruct our ability to accurately decipher[50] the jury's finding against the seller on the basis of a time-frame limitation regarding a defendant whose only reference at trial was that it sold the product.[51] Instead, we can safely conclude that the postmanufacture evidence likely tainted the determinative inquiry for both defendants—negligent design as of 1964.

[48] We are not persuaded by plaintiff's contention that Addy-Morand waived its objection to its liability. Addy-Morand's liability, in this case, was substantially similar to Cincinnati's liability because a design defect had to exist at the point of sale. Hence, if it was error requiring reversal for Cincinnati, Addy-Morand's liability is necessarily questioned.

[49] This is true when the manufacturer and the seller are different entities.

[50] We cannot say that the jury would not comprehend or forget the extensive postmanufacture evidence offered throughout this case in support of these postmanufacture duties.

[51] In closing argument, defense counsel argued to the jury that no evidence of negligence was presented against Addy-Morand. On rebuttal, plaintiff's counsel did not respond with any other theory or evidence of a breach.

VII

At issue in this negligent design case is the important question whether a manufacturer has a postmanufacture duty to repair or recall a product either found originally defective or defective in light of improved technology. In either case, absent some assumption of a duty or some controlling relationship, we elect not to impose such an onerous duty on manufacturers. The economic effect of such a duty is appropriately left for administrative agencies and the Legislature. When a product is originally defective and proof of that is advanced, a continuing duty to repair or recall theory serves nothing but to cloud the initial finding of negligence. When the product is rendered defective in light of improved technology, the commensurate effect is to discourage improvements in technology if the improvements can later serve as a basis of liability.

Because evidence at trial presented theories of repair and recall stemming from both initial design decisions and subsequently enacted standards rendering the product dangerous, we reverse the judgments against both Cincinnati and Addy-Morand. Postmanufacture evidence was irrelevant and served to taint any finding of negligence at the point of manufacture. Because liability in this case against both Cincinnati and Addy-Morand required the finding of a design defect, reversal is mandated for both defendants. Accordingly, we affirm the decision of the Court of Appeals and remand for a new trial.

BRICKLEY, C.J., and BOYLE and WEAVER, JJ., concurred with RILEY, J.

CAVANAGH, J. I respectfully dissent. I believe

that the verdict against the seller, Addy-Morand should be reinstated because I believe that no error occurred with respect to Addy-Morand. Additionally, I believe that the evidentiary points of error with respect to the verdict against the manufacturer, Cincinnati Incorporated, were either unpreserved or harmless.

I

The majority properly states that in an action against a nonmanufacturer seller, the plaintiff must "prove that a defect existed at the time of sale . . . ." RILEY, J., *ante* at 34. Yet, the majority reverses "regardless of the instruction that restricted the jury's consideration to the time when the press left Addy-Morand's control." *Id.* at 34-35. The majority reasons that postmanufacture evidence tainted the jury's verdict.

However, Addy-Morand was never mentioned in the substance of the trial. It was only mentioned during voir dire and in the jury instructions, and there was no independent evidence relating solely to Addy-Morand. More importantly, none of the postmanufacture evidence related to Addy-Morand. Further, the jury instructions relating to Addy-Morand clearly restricted the jury's focus to the moment of the point-of-sale. Additionally, Addy-Morand never objected to anything that may have been confusing in the jury instructions. I would hold that no error occurred with respect to the verdict against Addy-Morand. Consequently, I would reverse the Court of Appeals and reinstate the verdict.

II

I will turn now to the verdict with respect to the

manufacturer, Cincinnati Incorporated. In this negligent-design products liability case, postsale evidence about advancements in safety technology and about the manufacturer's conduct was presented to the jury as part of a continuing duty theory. However, I do not believe that the postsale evidence was used to support a theory that the product should have been made *safer* by technology discovered post sale. If that were the case, then clearly the "continuing" duty theory would have been improperly presented.[1] However, after a thorough review of the trial transcript, I believe that this was not the rationale for using the postsale evidence.

The plaintiff sought to show that as early as the 1890s, the industry knew that unguarded controls could cause serious injuries. The plaintiff also introduced a great deal of evidence concerning technology that was available in the 1950s. All of which, of course, was *pre*sale. The plaintiff presented substantial evidence that this press brake was defective, that is, it was unreasonably dangerous, at the point of *sale*. The plaintiff's theory was that *Comstock v General Motors Corp,* 358. Mich 163; 99 NW2d 627 (1959), recognized a *continuing* duty to rectify an unreasonable risk that *was* present at the date of sale. The postsale evidence therefore was relevant with regard to the standard of care. I would conclude that this theory was not erroneous.[2] As the amicus curiae, Michigan Trial

---

[1] See *Romero v Int'l Harvester Co,* 979 F2d 1444, 1446 (CA 10, 1992):

[A] manufacturer has no duty to notify previous purchasers of its products about later-developed safety devices, or to retrofit those products when the products were non-defective under standards existing at the time of manufacture.

[2] This Court stated in *Gerkin v Brown & Sehler Co,* 177 Mich 45,

Lawyers Association, suggests, there is

> a continuum of possible post-sale duties which the
> law might impose, ranging from a duty to warn or
> a duty to issue a recall to an affirmative duty to
> repair a defect. There are, in addition, numerous
> other facts which would have to be assessed on an
> individual, case-by-case basis in determining the
> appropriate scope of a manufacturer's post-sale
> duty—the original price of the product, the num-
> ber of units sold, the manufacturer's knowledge of
> the present users of the product, the nature of the
> defect discovered after the date of sale and, per-
> haps most important of all, the magnitude of the
> danger which has been exposed since the sale date.

Once the jury determines that the product was
unreasonably dangerous at the point of sale, it
would then have to determine the standard of care
and whether the defendant's actions were reason-
able, in light of that unreasonable dangerousness.

In this case, the trial court erred because it did
not clarify in the jury instructions that the jury
first had to determine that the product was unrea-
sonably dangerous at the time of sale, *before* it
could consider the postsale evidence in determin-
ing whether Cincinnati breached the standard of
care. However, Cincinnati is also partly at fault
for confusing the issues by presenting postsale
evidence and theories to the jury. I find that the
bulk of the postsale evidence was presented by *the
defense.* The defense's theory was to try to shift
the blame for a dangerous machine onto the *owner*
of the machine, who was the employer of the
plaintiff. This was trial strategy. Much of the
evidence pertained to Michigan OSHA require-
ments, which of course did not apply to the defen-
dants, but instead applied to Sheet Metal Indus-

_____

60; 143 NW 48 (1913), that there is a duty to warn of concealed
dangers and "to exercise a reasonable precaution for the protection of
others commensurate with the peril involved."

tries, the owner of the machine and the employer of the plaintiff.

### III

A review of the highlights of the trial where the postsale references occurred is instructive.

During motions in limine, the defendant[3] objected to any theory of continuing duty. The trial court stated:

> The Court has instructed defendant in that respect, to make his objections at any time that such evidence or comment is offered even if it is unfortunately at a point in which he must interrupt an opening statement.

Therefore, the obligation was on the defense to object to the particular evidence or comment in order to preserve its objection.

During the plaintiff's opening statement, counsel asserted:

> [W]e contend that the unguarded foot pedal . . . and unguarded point of operation were design defects and that . . . Cincinnati . . . knew or should have known that such design flaws could cause the type of injury that Mr. Gregory suffered both prior to selling the press to Sheet Metal Industries from 1964 *and at all times from 1964 until the day that Michael Gregory was injured.* [Emphasis added.]

There was *no objection.*

Continuing later, the plaintiff's counsel stated:

> Then we come to the key point. After the government required this in the early '70's, made this

---

[3] Cincinnati and Addy-Morand were represented during the substance of the trial by a single attorney.

a matter of law in the early '70's, the government placed a duty with respect to the employers, Cincinnati Machine did not in itself go back at this point and offer to fix the machines which it knew or should have known were in fact . . . defective. Instead it offered, for a price, . . . to come in and add two hand controls and a guarded foot switch which would have prevented this accident from occurring. . . . The evidence will show . . . conclusively that there is no real dispute, that they never offered once to recall the machine . . . .

Their case boils down to a sacred issue, and *the plaintiffs expect the evidence to show that the defendant Cincinnati Machine had a duty to fix the machine* . . . .

The evidence will show that between 1964 and that fateful date in 1986 when Michael lost much of his hands that Cincinnati learned time and again that this unguarded foot pedal and that the unguarded point of operation was smashing workers' fingers and hands but it did nothing, it stood back and denied its duty to guard the direct path which it had created. [Emphasis added.]

There was *no objection.*

During the *defense's* opening statement, counsel contended:

As the case is presently framed you are going to be asked to judge whether the machine was defective in 1964, that is whether it's unreasonably dangerous, was it safe to operate.

If we get into this post '64, if that turns out to be the case, that's up until the date of the accident which I said was '86, then no longer is the focus on the machine and whether it was dangerous or whether it was safe, but now the focus will be the actions of Cincinnati Incorporated and whether their actions were negligent or not; completely different focus. *So if we get into this area, '64 to '86, our proposition to you and our suggestion to you will be we acted reasonably and we acted*

*prudently.* The risk of injury to someone like Mr. Gregory didn't change from '[6]4 to '86, it remained the same. We are going to say that other manufacturers did nothing different than our manufacturers, nor did we refer to any codes that were referred to. In fact, what you may find, if it comes into the case, is between those two dates is Cincinnati offered to this company dual palm buttons. We believe—I am not sure if it will come in or not so my words you will have to check at the end of the case whether this comes in or not—in about 1978 this company asked about an update and they asked . . . us about dual paul [sic] buttons. And this company, this man's employer, eight months before the accident, we gave them a quotation; the quotation included dual palm buttons to take this machine from the operation of their foot pedal now to the operation of two buttons and they declined, though they chose to buy from us originally apparently. [Emphasis added.]

Therefore, *the defense* also indicated that it would counter with postsale evidence.

The plaintiff called as an adverse witness the defendant's product services coordinator, Dennis Cloutier. The plaintiff asked a question that was not fully responded to:

Do you agree that a manufacturer has an obligation, has a[n] obligation to keep abreast and keep informed with[ ] the developments within the industry and safety of [the] design of press brake[s]?

The witness responded that he guessed that a reasonable designer would. Note, the question could have pertained strictly to *presale* obligations; moreover, there was *no objection.*

Later, the witness testified:

*Q.* When did [Cincinnati] first manufacture[ ] two hand controls?

*A.* I believe it first showed up on some experimental machines in the '40's, 1948, '47.

*Q.* When did it first use electronic presence on the devices, press brakes?

*A.* Those were first introduced in this country in 1971 and that's when they were first used.

*Q.* When were they first used in Cincinnati's Machine subsidiary in Scotland.

*Mr. Goebel [Defense Counsel]:* I am going to *object that's not relevant* to 1971 [sic 1964?].

*The Court:* I will allow it.

*The Witness:* I believe there were a few machines in East Kilbrite Factory, East Kilbrite, Scotland. Some of the machines middle '60's, '67, '68 had some photo devices from Europe being put[ ] on them over there.

*Q.* Sir, moving forward to a period after 1964, did there ever come a time that the U[nited] S[tates] Department of Labor made it a matter of law that press brakes have foot pedal guards and two-handed controls?

*A.* My familiarity with the Occupational Safety and Health Act is that it does not specify the type of safeguarding . . . . [Emphasis added.]

Continuing later:

*Q.* Now, did Cincinnati Machine, with the knowledge of the hazards associated with the use of a guarded point of operation and unguarded foot pedal, did you ever in fact offer to provide this particular manufacturer [sic, owner] with two-handed controls and an electric foot switch?

*A.* Yes, sir.

*Q.* As to guarding?

*Mr. Goebel [Defense Counsel]:* Same objection as to relevance, *it's post 1964.*

*The Court:* I will allow it.

\* \* \*

*A.* I believe we initially sent correspondence to Sheet Metal Industries in 1976. And subsequent to

that in 1978, they requested a quotation to update and convert their machine and we quoted it again in 1978. [Emphasis added.]

This particular point *was* preserved by objection. Questioning continued regarding the price that Cincinnati quoted and whether it in fact ever recalled the machine.

The next day, questioning by *defense counsel* continued:

*Q.* Mr. Cloutier, there may be a claim in this case that after the date of sale of this machine but before Mr. Gregory was hurt that Cincinnati should have done something to help prevent the accident?

*A.* Yes, I have heard that.

The *defense's* questions continued about the nature and timing of mailings from Cincinnati to Sheet Metal through the 1970s, osha requirements, and a new safety development, a photoelectric device. This new device came out in 1970, and Cincinnati mailed information to Sheet Metal about it. *Defense* counsel also extensively questioned the witness about post-1964 service calls.

The plaintiff called Paul Youngdahl as an expert witness. Most of the testimony concerned pre-1964 technology and knowledge of risks. At the conclusion of direct examination, plaintiff asked about a breach of duty. The witness answered:

*A.* In my opinion if Cincinnati had not discovered the hazard and risk of injury in 1964, and thus didn't provide any point of operation protection and then discovered that hazzard [sic] and risk at some later time, *in my opinion they had a duty to correct* that defect in the machine. I am not saying that they should have corrected it necessarily at zero cost, but I believe they should

have corrected it at minimal cost to the purchaser of the machine.

\* \* \*

*Q.* Doctor, do you have an opinion to a reasonable degree of engineering certainty as to whether Cincinnati's *failure to correct* the defects on [the] number nine press brake on which Michael Gregory was injured, caused or contributed to Michael Gregory's hand to be crushed?

*A.* I have an opinion.

*Q.* What is your opinion?

*A.* In my opinion, if Cincinnati had corrected the defects in this press brake by putting on two-hand controls, as an example, *any time prior to the injury,* the accident . . . would not have happened. [Emphasis added.]

There was again *no objection.*

On cross-examination by *defense* counsel, the plaintiff's expert testified:

*Q.* I assume your opinion is, since the buttons or some other operator protection were not on in 1964 that the machine was not reasonably safe to operate?

*A.* Yes.

*Q.* You're critical of Cincinnati *between '64 and '86* because they didn't do something about that?

*A.* I am.

\* \* \*

*Q.* Let's assume for the sake of argument the machine is defective, Cincinnati is wrong. Let's take this argument, assume that, okay. Doesn't somebody who buys a machine in '64 and has it for 22 years have a responsibility to update that machine?

*A.* I think . . .

*Q.* In fact, that's what the law [is], isn't it?

*A.* I don't know about the law but it's my opinion they should.

*Q.* You know about OSHA, don't you?

*A.* Yes.

*Q.* You know that OSHA came into effect in approximately 1971?

*A.* I do.

\* \* \*

*Q.* Well, let's put it a different way. Certainly well before 1986 the requirement under the Federal regulations was for the use[r] to bring it up to standard. You would agree with that?

*A.* I would agree if they have a dangerous machine, OSHA said put protection on it. [Emphasis added.]

Continuing, later, *defense* again asked:

*Q.* So not only does that document that you have in front of you, but OSHA *says the employer, the person who owns the machine and sets it up and is going to make the parts has a responsibility to provide this point-of-operation protection;* is that not true?

*A.* Yes, OSHA has no jurisdiction over the manufacturer. [Emphasis added.]

The defense's strategy was *to shift the blame to the owner-employer,* Sheet Metal.

At the close of the plaintiff's proofs, defense counsel moved for a directed verdict on two grounds. First, that the continuing duty theory should not go to the jury. Second, that the proofs failed regarding a defect in 1964. The court denied both grounds. As to the first, the trial court stated:

*Evidence was introduced to point out that safety standards were changed by law at some point after the machine left the manufacturer and before the . . . accident involved in this case, and that's one of the factors that might lead a reasonable trier of fact to determine that there was continuing duty of some sort.*

There has also be[en] evidence submitted, *mostly by the defendant,* that would indicate that the defendant apparently felt some duty to inform owners of its machines that laws had changed and technology had changed and that it was prepared to offer a price and a procedure for making those changes. And all of those things I believe add up to enough to present that question of fact to the trier of fact. [Emphasis added.]

The trial court *was* in error regarding a duty arising *because* of changing safety standards. However, this statement occurred *out of the presence of the jury.*

The *defense* called Donald Wandling, a consulting engineer. On direct examination, he testified:

*Q.* Let me ask you, *between '64 and '86* there is in evidence Exhibit 12, a number of mailings by Cincinnati to Sheet Metal Industries. Do you have an opinion whether it was reasonable for Cincinnati to have sent those types of mailings to this gentleman's employer?

*A.* Yes.

*Q.* What is your, what's your opinion?

*A.* It was reasonable to do so.

*Q.* Let me [m]ake a hypothetical question? . . . Hypothetically this machine in '64 is unsafe, it's defective, doesn't have something that it should have and it's not safe for operation. I am going to work from that premise, okay?

*A.* Yes.

*Q.* And I want to work also from an assumption that in 1971 approximately the Federal government passed a regulation regarding safety use and operation of press brakes. I want you to assume that also?

*A.* Yes.

*Q.* Do you have an opinion whether *the owner* of the machine has the responsibility to bring this machine up to then current safety standards?

*A.* Yes.

*Q.* What's your opinion?

*A.* My opinion is that the, the owner does have a responsibility to do that . . . . [Emphasis added.]

Again, this was the defense's *trial· strategy.*

On cross-examination, the witness was asked, *without objection,* how many injuries Cincinnati knew of with respect to this machine before 1986. He was also questioned about mailings from Cincinnati to Sheet Metal in the 1970s.

The defense also called by subpoena Charles Collier, a Michigan Department of Labor employee who was an occupational safety inspector. He was questioned about regulations in the 1970s and as existing in 1986.

The conference discussion regarding proposed jury instructions occurred before closing arguments. The defense objected to the court's failure to include instructions that would have stated that the duty ends at the time of sale. The defendant in particular objected to the following proposed instructions that the court did not give:

[Proposed] Jury Instruction No. 7: When you deliberate to determine whether the evidence proves that there was any defect with the product, it is your duty to determine if the product *was defective when it left the possession of Cincinnati Incorporated in 1964.* Cincinnati Incorporated is not to be judged by the state of the art, industry practices, or evidence produced or made known subsequent to the sale of the product in 1964.

No. 8: The plaintiff has alleged that the press brake was defective in 1964. In order to prove this claim, plaintiff must prove that Cincinnati Incorporated was negligent or the product *was defective when it left Cincinnati in 1964,* based upon the knowledge and standards existing in 1964. [Emphasis added.]

The court reasoned that the Michigan cases indicated that there was a continuing duty theory. I believe the court erroneously failed to give these instructions. They would have clarified that the jury first had to find a defect in 1964 before turning to the issue of standard of care after 1964.

During closing argument, the plaintiff referred to the post-1964 evidence as pointing to the defendant's failure to exercise reasonable steps in correcting the defect. The defense basically countered that the steps that it took were reasonable.

At the start of the jury instructions, the trial court thanked the jurors and gave them the usual instructions about their duty to examine the evidence, the use of circumstantial evidence, the proper use of inconsistent statements, etc. The court then defined negligence, ordinary care, proximate cause. The court continued:

> However, if you decide that the only proximate cause of the injury was the conduct of Sheet Metal Industries, which is not a party to this suit, then your verdict is for the defendant.
> The employer Sheet Metal Industries has a statutory duty to furnish a place of employment free from recognized hazards causing or likely to cause death or serious bodily injury.

After explaining the burden of proof and comparative negligence, the court continued:

> When I use the words "implied warranty" as to Add[y][-]Morand Company, I mean a duty imposed by law which requires that the seller's product be reasonably fit for the purposes and uses intended or reasonably foreseeable by the seller. We will talk about the burden of proof as to this claim of breach of implied warranty.
> The plaintiff h[a]s the burden of proof on each of the following as to Add[y][-]Moran[d] Company:

First, that the press brake was not reasonably fit for the uses or and [sic] purposes anticipated or reasonably foreseeable by Add[y][-]Moran[d] Machinery Company in one or more the ways claimed by the plaintiff.

Second, that the press brake was not reasonably fit for the uses or purposes anticipated or reasonably foreseeable by Add[y][-]Moran[d] Machinery Company *at the time it left Add[y][-]Moran[d]'s control.*

Third, that the plaintiff was injured.

Fourth, that the lack of operator protection was a proximate cause of the injuries to the plaintiff complained of.

* * *

Cincinnati Incorporated had a duty to use reasonable care at the time it designed and manufactured its press brake so as to eliminate unreasonable risks of harm or injury which were reasonably foreseeable. This duty includes guarding against misuse, when misu[s]e is reasonably anticipated.

However, the defendant had no duty to design and manufacture[ ] its press brake to eliminate reasonable risk of harm or injury or risks that were not reasonably for[e]seeable. The law does not impose a duty on a manufacturer to make an accident-proof machine.

Reasonable care means that degree of care which a reasonably prudent manufacturer would exercise under the circumstances which you find existed in this case. It is for you to decide, based on the evidence, what a reasonably prudent manufacturer would do or not do under those circumstances.

A failure to fulfill the duty to use reasonable care is negligence.

*A manufacturer has a further duty to [k]eep abreast of and be informed of the developments in the field of safety, design and manufacture and to reasonably incorporate new advances in safety technology into the design and manufacture of its*

*product.* There is no obligation on the part of the manufacturer to provide every possible new device which might possibly have been conceived or invented.

*Further, a manufacturer who learns of a design defect after the product has been sold has a duty to take reasonable actions to correct the defect. It is for you to determine what constitutes reasonable actions.* [Emphasis added.]

I believe that the duty to keep abreast of developments could clearly be interpreted as pertaining to presale obligations. The latent defect instruction is arguably straight from the *Comstock* case. Therefore, I would hold that the instructions were not improper—just incomplete.

The trial court continued with instructions on comparative negligence. It then gave instructions on damages that were applicable to both Cincinnati and Addy-Morand. It concluded with instructions on how the jury should deliberate and how to fill out the special verdict form.

Five of the six jurors agreed that Addy-Morand was liable, that Cincinnati was liable, that the total damages were $1.5 million, and that the plaintiff was thirty-three percent at fault.

IV

In conclusion, I believe that preserved error occurred because the trial court did not clarify the jury instructions with regard to the manufacturer, Cincinnati Incorporated. The court failed to give the defense's proposed instructions that would have limited the determinative point for a design defect to the point of sale. Further, the trial court did give an instruction that a manufacturer has a duty to take reasonable steps after a design defect is discovered, i.e., a latent defect. While this latter

point is arguably correct, it confused the issue because the plaintiff's theory was that the defect existed at the point of sale. The court should have more clearly emphasized that postsale conduct related to the standard of care—not to the original finding of defectiveness at the point of sale.

However, I believe that any error was harmless because there was substantial evidence that the press brake was unreasonably dangerous under the prevailing standards in 1964,[4] and because the postsale evidence was presented primarily by the defense as trial strategy, or was presented by the plaintiff without objection. The one or two preserved evidentiary points of error, relating to post-1964 technology, were arguably waived by the defense's opening statement, or were waived by the defense's trial strategy of using postsale safety standards to support its theory that the owner of the press brake, Sheet Metal, had a duty to update the press brake with this postsale safety technology.

Therefore, I would reverse the decision of the Court of Appeals and reinstate the verdicts against both Cincinnati Incorporated and Addy-Morand.

MALLETT, J., concurred with CAVANAGH, J.

LEVIN, J. (*dissenting in part*). I agree with the majority that, on the facts of this case, the trial court erred in permitting plaintiff Michael Gregory to present a theory of recovery against defen-

---

[4] The majority admits that "there was some proof offered of negligent design as of 1964." RILEY, J., *ante* at 29. At oral argument, defense counsel also admitted that there was sufficient evidence that the press brake was defective in 1964. More importantly, the jury also determined that the press brake was actionable as of 1964, as evidenced by its verdict that Addy-Morand breached an implied warranty that the press brake was reasonably fit for its intended uses at the time it left Addy-Morand's control—in 1964.

dant Cincinnati Incorporated based on a postsale obligation to recall the allegedly defective product. I would, however, affirm the verdict against the defendant seller, Addy-Morand Machinery Company. I also write separately to clarify the analysis for determining when such obligations might arise.

I

The majority correctly notes that imposing postsale obligations is unnecessary where a product is defective at the time of sale. If a product is defective at the time of sale—whether through faulty manufacture or negligent design—the manufacturer is liable for all harm proximately caused by the defect.[1] No additional finding of a breached duty is needed to impose liability.

It does not follow, however, that there can never be a postsale obligation to recall a product. In some cases, a manufacturer may have an obligation to protect against dangers posed by products that were not defective when originally sold. A product may prove to be unreasonably dangerous without having been negligently designed.[2] Newly developed drugs are an example. The manufacturer may have used all reasonable care in designing the drug. Yet unreasonably dangerous effects of the drug may become apparent once the drug is on the market. See *Beshada v Johns-Manville Products Corp,* 90 NJ 191, 196-197; 447 A2d 539

---

[1] *Smith v E R Squibb & Sons,* 405 Mich 79, 89; 273 NW2d 476 (1979); *Prentis v Yale Mfg Co,* 421 Mich 670, 695; 365 NW2d 176 (1984).

[2] There is unlikely to be a need for a postsale obligation in connection with manufacturing defects. In such cases, the harm is not caused by an unforeseeable risk. Rather, the danger arises because the product deviates from the manufacturer's own production standards. *Prentis,* n 1 *supra,* p 683.

(1982), noting that the dangers of asbestos were unknown for decades.[3]

In such a case, a manufacturer who learns or should learn of an unreasonable product-related danger has an obligation to take reasonable steps to prevent the product from causing harm. Describing this obligation as relating to a "product defect" confuses matters. Michigan defines a product defect in terms of the manufacturer's knowledge and design choices *at the time of manufacture and sale* of the product.[4] Recognizing a postsale obligation only has meaning when the product is not initially defective.

Any postsale obligation should be viewed as arising out of the general duty to exercise reasonable care for the safety of others. As one commentator explained:

> The manufacturer's duty of due care extends beyond the sale of a product. . . . The extent of that duty depends on many circumstances . . . dictating the conduct of a reasonable person.[5]

This proposition represents no great change in tort law:

---

[3] Such a situation should be distinguished from a case in which new technological advances render an original design obsolete. This Court should recognize a postsale obligation with regard to *dangers* not reasonably foreseeable at the time of sale as distinguished from unknown safeguards to avoid known dangers.

The majority properly notes that this case does not require that the Court consider postsale obligations involving "dangers discovered after the product enters the market." *Ante,* p 17, n 18.

[4] *Prentis,* n 1 *supra,* p 691. As mentioned in n 2 *supra,* this would not include manufacturing defects.

[5] 2 Lee & Lindahl, Modern Tort Law Liability & Litigation (rev ed), § 27.17, p 564. See also *Johnson v Colt Industries Operating Corp,* 609 F Supp 776, 782 (D Kan, 1985), aff'd on other grounds 797 F2d 1530 (CA 10, 1986) ("[w]hether a manufacturer has a duty to recall in any given case is incorporated into the concept of due care as it applies to negligence actions generally"); *Jones v Bender Welding & Machine Works,* 581 F2d 1331, 1335 (CA 9, 1978) (imposing a postsale obligation "to act in a reasonable fashion").

[W]hy should a manufacturer's duty to behave reasonably (and thus not negligently) toward a consumer end at the moment the product is sold? Courts traditionally impose a duty on individuals to remedy hazards they create. The duty to recall seems to be merely a reasonable extension of the doctrine into the field of products liability. Once a manufacturer has created a hazard, it must take all reasonable precautions to remedy it.[6] [See also 2 Restatement Torts, 2d, § 321, p 132.][7]

Where an unreasonable danger of a product was unknown and unknowable at the time of sale, a manufacturer who later learns of the danger is under an obligation to exercise reasonable care to protect against that harm.[8] In many cases, that obligation will require warnings. In others, meeting the standard of reasonable care may require recall. This might occur, for example, where there is a risk of great danger, or where the product can readily be made safe.[9]

[6] Lamken, *Efficient accident prevention as a continuing obligation: The duty to recall defective products*, 42 Stan L R 103, 106 (1989). This statement was made as a summary of an argument, not as a statement of the author's position. The author agreed that there is an obligation to recall in certain contexts. *Id.*, p 153.

[7] The Restatement, § 321 provides that an actor who "subsequently realizes or should realize that [his act] has created an unreasonable risk of causing physical harm to another . . . is under a duty to exercise reasonable care to prevent the risk from taking effect." This applies even if the prior act was not negligent.

[8] *Id.; Braniff Airways, Inc v Curtiss-Wright Corp*, 411 F2d 451, 453 (CA 2, 1969), ruling that when design defects threatening "human safety" come to the attention of the manufacturer after the sale of a product, "the manufacturer has a duty either to remedy these or, if complete remedy is not feasible, at least to give users adequate warnings and instructions concerning methods for minimizing the danger."

[9] The majority recognizes that courts have imposed postsale duties to recall under such circumstances. *Ante*, pp 24-25 (duty to repair or recall where the danger is severe), *id.*, p 25 (obligation to modify a product where the manufacturer knows the identity of the product's owner because of a postsale relationship).

## II

The majority should not distinguish between a postsale obligation to warn and an obligation to repair or recall. Warnings and repairs are properly viewed not as different obligations but simply different points on "a continuum of post-sale precautions . . . ."[10] A recall is simply a warning to buyers accompanied by an offer to bear the cost of making needed changes in the defective product.

This becomes clearer by recognizing that the term "duty to warn" is something of a misnomer. Strictly speaking, in a negligence action, the manufacturer's "duty" to a customer is to "produce and market articles with reasonable care under the circumstances."[11] In certain cases, meeting that standard of care requires warnings. But in others, the standard of care may require more than simply notifying buyers of a risk:

> While "warning" provides a convenient characterization of the manufacturer's post-sale obligations, the manufacturer's responsibility may range from providing the buyer with a corrective device, to the simple sending of a letter. [1 Madden, Products Liability (2d ed), § 10.13, p 456.][12]

---

[10] Lamken, n 6 supra, p 105.

[11] Lee & Lindahl, n 5 supra, § 27.12, p 556.

[12] The majority's effort to limit this Court's decision in *Comstock v General Motors Corp*, 358 Mich 163; 99 NW2d 627 (1959), is unpersuasive.

The majority distinguishes *Comstock* on the basis that, unlike this case, it involved a latent defect. It defines a latent defect as a flaw the manufacturer "knew or should have known of " at the time of sale.

This argument misapprehends the meaning of "latency." Manufacturers warn of defects because *the customer* would fail to know of the danger. "Latency" describes "a potential for injury that is not readily apparent *to the user* . . . ." Madden, *supra*, § 10.1, p 357. (Emphasis added.) Latency, for purposes of an obligation to warn buyers, cannot properly be defined in terms of the seller's knowledge.

### III

On the facts of this case, it was error to permit Gregory to pursue a theory based on a postsale obligation to repair or recall. The danger posed by the press brake was well known in 1964, when it was manufactured. It had been widely recognized for decades. This was not a case of an unreasonable danger that was unknown and unknowable in 1964. If Cincinnati is liable to Gregory, such liability should be predicated on a product defect existing in 1964. I agree with the majority that the instructional error and the error in the admission of evidence was not harmless and requires that the verdict against Cincinnati be reversed.

### IV

I would, however, affirm the verdict against the seller, Addy-Morand Machinery Company. The errors with regard to the introduction of evidence and jury instructions concerning the manufacturer, Cincinnati Incorporated, did not taint the verdict against the seller, Addy-Morand. In contrast to the instructions regarding the design defect claim against Cincinnati, the instructions on the breach of warranty claim against Addy-Morand unambiguously required the jury to consider the condition of the press brake at the time it left Addy-Morand's control:

> When I use the words "implied warranty" as to Addie Moran [sic] Company, I mean a duty im-

---

The principle described by *Comstock* should not be limited to latent defects. *Comstock* ruled that the manufacturer's duty of reasonable care continued after the sale of a product. On the facts of that case, "reasonable care" required postsale warnings. But in other cases, "reasonable care" may involve different or additional steps.

posed by law which requires that the seller's product be reasonably fit for the purposes and uses intended or reasonably foreseeable by the seller. We will talk about the burden of proof as to this claim of breach of implied warranty.

The plaintiff [has] the burden of proof on each of the following as to Addie Moran Company:

* * *

Second, that the press brake was not reasonably fit for the uses or purposes anticipated or reasonably foreseeable by Addie Moran Machinery Company *at the time it left Addie Moran's control.*

Moreover, the instructions regarding continuing duty specifically applied to the manufacturer, Cincinnati, only:

A *manufacturer* has a further duty to [k]eep abreast of and be informed of the developments in the field of safety, design and manufacture and to reasonably incorporate new advances in safety technology into the design and manufacturer [sic] of its product. There is no obligation on the part of *the manufacturer* to provide every possible new device which might possibly have been conceived or invented.

Further, a *manufacturer* who learns of a design defect after the product has been sold has a duty to take reasonable actions to correct the defect. It is for you to determine what constitutes reasonable actions. [Emphasis added.]

The majority nevertheless reverses the verdict against Addy-Morand and remands for a new trial on this count. The majority states that because Gregory did not allege that Addy-Morand breached the implied warranty independently of the actions of Cincinnati, any error in the verdict against the manufacturer infected the verdict against Addy-Morand. I do not agree.

The verdict against Addy-Morand did not necessarily derive from the verdict against Cincinnati. As the majority notes, "there was some proof offered of negligent design as of 1964."[13] Defense counsel conceded at oral argument that Gregory presented evidence that the press brake was defective in 1964, the year it was manufactured. Neither defendant has challenged the sufficiency of this evidence.

It was this evidence, and not the verdict against Cincinnati, that supported a verdict against Addy-Morand.[14] To be sure, "there was no other evidence of negligence or breach of warranty as far as Addy-Morand is concerned . . . ."[15] But that is not relevant because there was evidence that the product was defective or not reasonably fit at the time it was manufactured.

My view of this case does not rest on the assumption that juries comprehend and remember every nuance of the instructions. The instructions are the background against which the parties present their summation of the evidence. A party relying on a particular instruction may emphasize that instruction or ask the jury to pay particular attention to it. In this case, confusion between the breach of warranty claim against Addy-Morand and the instructions that Cincinnati had a continuing obligation could have been avoided by emphasizing the differences between the claims. The defendants neglected to make the distinction as a

---

[13] *Ante,* p 29.

[14] [U]nder the common law of products liability, in an action against the manufacturer of a product based upon an alleged defect in its design, "breach of implied warranty and negligence involve identical evidence and require proof of exactly the same elements." [*Prentis,* n 1 *supra,* p 692, quoting *Smith,* n 1 *supra,* p 88.]

[15] 202 Mich App 474, 486; 509 NW2d 809 (1993).

matter of trial strategy, and it therefore cannot form the basis for a claim of error.[16]

Nor would I infer from the proper verdict against Addy-Morand that any instructional error respecting the claim against Cincinnati was harmless. A different conclusion might be appropriate if the jury's verdict against Addy-Morand followed a defense argument that the jury could find in favor of Addy-Morand even if it found against Cincinnati on the continuing duty theory, in which event the verdict would necessarily reflect a determination that the press brake was defective at the time it was manufactured. On the present record, however, it cannot be concluded with the requisite degree of certainty that the jury would have rendered the same verdict had it been properly instructed on the claim against Cincinnati.

Accordingly, while I agree with the majority that the verdict against Cincinnati should be reversed, I would reinstate the verdict against Addy-Morand.

[16] I also note that Addy-Morand did not ask for a separate trial or jury.