Thomas G. FLECK, Jr., Plaintiff,

v.

**TITAN TIRE CORPORATION,**
Defendant.

No. 98–10257–BC.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 4, 2001.

Opinion and Order Denying
Reconsideration Oct.
31, 2001.

Daniel W. White, Alpena, MI, for plaintiff.

Dennis S. Kayes, Matthew J. Lund, Detroit, MI, for defendant.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

LAWSON, District Judge.

The plaintiff commenced an action in the Alpena County, Michigan Circuit Court contending that he was severely injured when a tire designed and manufactured by the defendant exploded while the plaintiff was trying to mount it on a wheel rim. The plaintiff alleges that the tire's design was defective and that it was not reasonably fit for its intended purpose. The defendant removed this action to this Court on the basis of the Court's diversity jurisdiction, 28 U.S.C. § 1332, and has now moved for summary judgment. The Court entertained the arguments of the parties through their respective counsel in open court on April 12, 2001. Because the Court determines that the defendant before the Court did not design the tire, and that there is no genuine issue of material fact on the question of the defendant's freedom from negligence in manufacturing the tire, the Court will grant the defendant's motion for summary judgment as to counts one and two of the complaint. However, the motion will be denied as to count three because there is a material factual dispute that must be resolved at trial on the question of whether the defendant breached its implied warranty.

## I.

The plaintiff, Thomas Fleck, was injured while he was installing a new tire on a customer's wheel rim while he was employed at the Quality Farm and Feed store in Alpena, Michigan. Quality Stores Corporation of Muskegon, Michigan is the largest farming goods retailer in the United States and operates 350 stores nationwide. The Alpena store, known as Quality Farm and Fleet ("QF & F"), sells and installs automobile tires in its motor vehicle service department, which consists of a dual-bay garage containing two professional tire mounting machines, among other equipment.

The plaintiff, a high school graduate with no additional vocational training, was hired by QF & F as an "assembler" in April 1997. His responsibilities included assembling barbeque grills, garden tractors and a variety of other implements.

Several weeks after plaintiff's hire, an employee by the name of Robert Besky on one occasion was falling behind in his duties. Besky was primarily responsible for the installation of tires in the automotive service department. Management asked the plaintiff to work with Besky and, after being "shown the ropes," the plaintiff was deemed a "tire installation employee" for the duration of his tenure at QF & F through 1999. According to QF & F's policy, as a tire installer plaintiff was to receive educational manuals, view a training video, and be exposed to hands-on instruction. However, the plaintiff received only limited instruction provided by Besky sufficient to allow plaintiff to install tires.

Besky left within weeks of the plaintiff beginning tire installation duties. Although he was not put in a supervisory role, the plaintiff assumed most of Besky's duties, with the assistance of co-employee Brian Morgan as needed. The usual procedure, as asserted by plaintiff and Morgan but contested by management, was that "the manager and the salespersons did all the selling of the tires and then they told [Morgan and plaintiff] which tires to put on." Brian Morgan Dep. at 31.

On July 3, 1997, approximately three months after his hire and having installed approximately 100 tires for QF & F, Thomas Fleck Dep. at 39, the plaintiff was

summoned to the service department to install tires on a four-wheel-drive light duty pick-up truck estimated to be a model produced in the 1970s. In what has been alleged to be "typical fashion," plaintiff reported to store manager Stan Windy. When the plaintiff arrived at the service bay in the garage, the tires had been "pre-selected" for him and were lying on the floor of the garage. Windy directed the plaintiff to install the tires on the pick-up truck.

It is undisputed that the plaintiff began the installation by utilizing what he recalled to be a "Coates" model tire changing machine with a vertical "pipe" and "cone-type screw cap." Fleck Dep. at 54–56. Plaintiff also recalled that although an air hose with a "clip-on chuck" and "in-line" air pressure gauge was available to enable an employee to attach the hose to the tire's valve stem and step away during inflation, plaintiff did not use that air hose. Rather, plaintiff recalls that he used another air hose without a clip-on chuck and in-line gauge, which required him to hold the air hose against the valve stem to inflate the tire and to check air pressure with a hand-held pressure gauge. Fleck Dep. at 71.

Unbeknownst to the plaintiff, the rims on the truck were 16.5 inch aftermarket production rims. The size of the rims was not apparent simply by looking at them. Windy believed them to be 16.0 inch rims, and plaintiff did not attempt to verify the rim size or check the size of the tire. The tires selected for installation were 16.0 tires intended for use exclusively on 16.0 inch rims. Due to the minimal size difference between 16 inch and 16.5 inch rims and the recognized danger of explosion caused by inflating a 16 inch tire on a 16.5 inch rim, 16 inch tires, including the subject tire, display a warning on the sidewall cautioning against installation on 16.5 inch rims. The subject 16 inch tire carried the following warning on the sidewall:

CAUTION—DO NOT USE ON 16.5 DIA. TUBELESS RIM

LT 235/85R16

MOUNT ONLY ON 16″ RIMS APPROVED FOR RADIAL LT TIRES.

DANGER: MAINTAIN RECOMMENDED TIRE PRESSURE AND FOLLOW OWNER'S MANUAL OR VEHICLE TIRE PLACARD. ONLY SPECIALLY TRAINED PERSONS SHOULD MOUNT TIRE. TO AVOID FATAL EXPLOSION, NEVER EXCEED 40 PSI TO SEAT LUBRICATED BEADS ON CLEAN UNDAMAGED RIM. UNDER INFLATION/OVERLOADING, IMPROPER REPAIRS CAN CAUSE SUDDEN FAILURE. INSPECT REGULARLY FOR DAMAGE. IMMEDIATELY REPAIR PUNCTURE PROPERLY. NEVER MIX RADIAL AND NON RADIAL TIRES ON SAME AXLE OR RADIAL ON FRONT AND NON RADIAL REAR.

Plaintiff did not attempt to determine the size of the wheel rims on the pickup truck. If he had attempted to ascertain the rim diameter, however, he only would have observed incomplete markings on the rim. Nevertheless, plaintiff still could have checked the size of the old tires he was removing from those rims, which were in fact marked as 16.5 inch tires. The plaintiff assumed that Windy selected the appropriate tires to match the wheels.

According to the plaintiff, he removed the first of the four tire/rim assemblies from the truck. He then locked it down on the tire changing machine, and proceeded to "break down" and remove the old tire from the rim. With the rim still on the changing machine, the plaintiff took

one of the pre-selected tires and installed it on the rim. He then attached the chuck end of the air hose on the valve stem and began trying to inflate the new tire, without success. Then, the plaintiff removed the tire/rim assembly from the mounting machine, reinserted the chuck in the valve stem with the tire standing on its tread, and resumed inflating while bouncing the tire and pushing down against it. The tire started taking air, so the plaintiff laid it on its side and continued to inflate it. The plaintiff testified that he heard one small "pop" which he believed to be one of the beads "seating" against the rim flange. He continued inflating, and an explosion occurred seconds later. Although the plaintiff does not recall looking at a gauge as he inflated the tire on its side, he estimates that the tire pressure had reached 25 to 30 pounds when the tire exploded. The explosion of the tire shattered bones in the plaintiff's right arm and hand allegedly causing permanent injury.

The tire in question was manufactured by defendant, Titan Tire Corporation ("Titan"). Titan, an Illinois corporation headquartered in Iowa, agreed to manufacture the tire for the Pirelli Armstrong Tire Corporation ("Armstrong"). Armstrong supplied the design specifications, determined the language and placement of the warnings, and sold the tires to its distributors, including QF & F. It is undisputed that Titan did not contribute to the actual design of the tire.

It appears that the plaintiff did not learn that the named defendant was not the designer of the tire until after the period of limitations expired as to Armstrong. In all events, there has been no effort to join Armstrong in this lawsuit. Titan has moved for summary judgment, contending that since it did not design the tire, and there is no evidence that it was negligent in manufacturing the tire, the plaintiff can-

not establish liability. Titan also has cataloged a list of negligent acts committed by the plaintiff which, the defendant argues, preclude a finding of causation. Those acts include mismatching the tire and rim size; removing the tire and rim from its locked-down position on the mounting machine to inflate the tire; failing to lubricate the beads of the tire; hitting or bouncing the tire against the ground and using the entire weight of his body to force the beads of the mismatched tire to seat; inflating the tire without an extension hose equipped with a clip-on chuck and in-line gauge which would have allowed him to stand a safe distance from the tire trajectory zone during inflation; standing directly in the tire trajectory zone when inflating the tire; and inflating the tire without a restraining device. Finally, the defendant asserts that plaintiff's failure to warn claim should be dismissed in that additional warnings would not have been heeded by plaintiff, and furthermore, QF & F as a tire distributor qualified as a "sophisticated user" of the product.

In response, the plaintiff, while acknowledging that Titan is not the designer and that the tire was manufactured according to specifications, argues that Titan is negligent nonetheless because the design of the tire was so obviously defective that no reasonable person would have manufactured a tire to those design specifications. Based on this premise, the plaintiff advances three theories of liability against the defendant: (1) that the defendant negligently "designed *and produced*" an unsafe tire whose bead wires were of insufficient strength to prevent explosion in cases where the tire was mismatched with a 16.5 inch rim (Count I); (2) that the defendant failed to properly warn the plaintiff of the danger of a mismatch explosion (Count II); and (3) that the defendant breached its implied warranty that the tire was reasonably fit for the purposes and

uses intended or reasonably foreseeable, including the mismatched mounting of the tire on a 16.5 inch rim (Count III).

## II.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* "The test is whether the party bearing the burden of proof has presented a jury question as to each element of the case." *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000). Summary judgment is not a vehicle for a trial by affidavits; the court looks only to determine whether there is a genuine issue for trial. *DBM Technologies, Inc. v. Local 227,* 257 F.3d 651, 655–56 (6th Cir.2001).

A party may support a motion for summary judgment by demonstrating that an opposite party, after sufficient opportunity for discovery, is unable to meet her burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not merely rely upon the pleadings to oppose a motion for summary judgment but must come forward with affirmative evidence in the form of materials described in Rule 56(c) to establish a genuine issue on a material fact. *Id.* at 324, 106 S.Ct. 2548. Even in complex cases, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In order to establish an genuine issue on a fact that is material, that is, a fact of consequence to the determination of the action, the party opposing the motion for summary judgment must demonstrate specific facts, as opposed to mere conclusions, which creates a triable issue on each of the elements of her claim. When expert testimony is necessary to establish an element of a claim, the expert's affidavit likewise must be based on facts, and reasonable inferences drawn therefrom. *Williams v. Ford Motor Company,* 187 F.3d 533, 543 (6th Cir.1999). The mere presence of opposing experts does not guarantee "a free pass to trial every time that a conflict of fact is based on expert testimony." *Id.* at 544. The ability of the expert witness to rely on inferences more so than a lay witness does not discharge him of his responsibility to provide a factual basis and process of reasoning that makes his conclusions viable for summary judgment purposes. *Id.* at 544.

## III.

As noted above, the defendant has invoked this Court's jurisdiction on the basis of diversity of citizenship. In federal cases based on diversity jurisdiction, the court must apply state law as dictated by applicable state's highest court and legislature. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.' " *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V & O Press Co.,*

770 F.2d 601, 604 (6th Cir.1985)). "Relevant data" includes the state's intermediate appellate court decisions, *id.*, as well as the state supreme court's relevant *dicta*, "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broad. Corp.*, 820 F.2d 806, 807 (6th Cir.1987).

In this case, Michigan law governs. The Court therefore shall examine the plaintiff's complaint under Michigan law and in light of the defendant's three arguments to determine whether the evidentiary materials submitted create a genuine issue of fact for trial.

### A.

In Michigan, a products liability action is defined by statute as "an action based on a legal or equitable theory of liability brought for the death of a person or liability for injury to a person or damage to property caused by or resulting from the production of a product." Mich. Comp. Laws § 600.2945(h) (West Supp.2001). By "product," the statute refers to any and all of its component parts. Mich. Comp. Laws § 600.2945(g) (West Supp.2001). "Production" of a product includes its "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling." Mich. Comp. Laws § 600.2945(h) (West Supp.2001).

██ Traditional principles of products liability law recognize three types of defects: manufacturing defects, defects due to faulty design, and defects due to inadequate instructions or warnings. *Restatement (Third) of Torts: Products Liability* § 2 (1998). To provide compensation for injuries caused by such defects, Michigan recognizes two distinct causes of action for product failures: negligence and implied

warranty. *Gregory v. Cincinnati, Inc.* 450 Mich. 1, 12, 538 N.W.2d 325, 329 (1995); *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736–37 (6th Cir.2000).

██ As a general rule, the negligence action focuses on the conduct of the manufacturer, whereas implied warranty focuses on the condition of the product. *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 692, 365 N.W.2d 176, 186 (1984). These theories are not always mutually exclusive. When used to attack design and warning defects, the two theories may effectively require the same elements and proofs. *Bouverette v. Westinghouse Elec. Corp.*, 245 Mich. App. 391, 395, 628 N.W.2d 86, 90 (2001). As a result, in design defect cases against a manufacturer, only a negligence cause of action is cognizable. *Prentis*, 421 Mich. at 693, 365 N.W.2d at 186. Nonetheless, the two causes of action remain separate theories with distinct elements. *Lagalo v. Allied Corp.*, 457 Mich. 278, 287 n. 11, 577 N.W.2d 462, 466 n. 11 (1998).

██ The negligence cause of action recognizes that manufacturers have a duty to use reasonable care to design and produce a product that is reasonably safe for its intended, anticipated, or reasonably foreseeable use. *Prentis*, 421 Mich. at 694, 365 N.W.2d at 187. To demonstrate a design defect, Michigan law imposes a heavy burden upon plaintiffs, who must prove the following:

(1) that the severity of the injury was foreseeable by the manufacturer; (2) that the likelihood of occurrence of her injury was foreseeable by the manufacturer at the time of distribution of the product; (3) that there was a reasonable alternative design available; (4) that the available alternative design was practicable; (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk

of harm posed by defendant's product; and (6) that omission of the available and practicable reasonable alternative design rendered defendant's product not reasonably safe.

*Hollister,* 201 F.3d 731 at 738. Thus, to succeed in a negligence cause of action, the products liability plaintiff must prove actual fault. *Prentis,* 421 Mich. at 688–90, 365 N.W.2d at 184–85.

There is no dispute that Titan produced the tire to specifications dictated by Armstrong, including the language and placement of warnings on the tire cautioning installers that the tire should not be placed on a 16.5 inch wheel. Therefore, Titan argues that count one alleging a design defect must be dismissed.

 *Design* defect claims must be distinguished from *manufacturing* defect claims. The former is generally alleged when a defect is apparent in all like products manufactured in conformance with a design. *Cavalier v. Werner Co.,* 976 F.Supp. 672 (E.D.Mich.1997). The latter is generally alleged when the accident product differs from comparable products typically produced by the manufacturer. *Id.* "[U]nlike manufacturing defects, design defects, result from deliberate and documentable decisions...." *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 689, 365 N.W.2d 176, 185 (1984).

The plaintiff acknowledges that he does not allege a manufacturing defect. Rather, he urges the Court to construe count one as a claim against defendant for manufacturing the subject tire pursuant to an "obviously defective and dangerous" design.

 Michigan law also recognizes another form of manufacturer liability when the manufacturer is not the designer of the product. In *Huff v. Ford Motor Co.,* 127 Mich.App. 287, 338 N.W.2d 387 (1983), the Michigan Court of Appeals held that a manufacturer of a product made according to the design specifications of its customer could be liable to a third party injured by the product if the design specifications were so obviously defective and dangerous that no reasonable person would follow them. *Id.* at 294–95, 338 N.W.2d at 390–91. In that case, defendant Envirofab manufactured a waste storage tank which was designed by another contractor and installed at a Ford Motor Company engine plant. The tank design did not include ventilation or internal lighting. The plaintiff was a painter hired to apply a coating to the inside of the newly-fabricated tank. The coating emitted volatile fumes. While he was in the tank, the plaintiff dropped an unguarded electrical light which emitted sparks and caused an explosion, severely burning and eventually killing the plaintiff. The Michigan Court of Appeals held that, as a general rule, a manufacturer who fabricates a product according to the plans furnished by its customer is not liable for design defects in the product. However, the Court, following a decision by the Fourth Circuit and quoting language from a treatise, held that an exception to this rule applies when the plans and specifications "are so obviously defective and dangerous that no reasonable man would follow them." *Id.* at 294–95, 338 N.W.2d at 390–91 (citing *Spangler v. Kranco, Inc.,* 481 F.2d 373 (4th Cir.1973) and (quoting Prosser, *Law of Torts,* (4th ed.) § 104, p. 681)). Thus, the court held, "in order to withstand summary judgment ... the plaintiff must support her claim on the record with facts tending to show that [the designer's] design and specifications were obviously dangerous and defective." *Huff,* 127 Mich.App. at 295, 338 N.W.2d at 391.

The rule in *Huff* is still good law in Michigan, although it has been found by this Court not to apply to absolve a manu-

facturer of component parts from certain design defect claims as to a completed product. *See Childress v. Gresen Mfg.*, 690 F.Supp. 587, 590 (E.D.Mich.1988), *aff'd,* 888 F.2d 45 (6th Cir.1989). The rule and the exception create a fine distinction when applied to the manufacturer of a completed product which contains an alleged defect designed into the product by the manufacturer's customer. The manufacturer is not liable for ordinary defects, but may be liable for "obvious" ones.

■■ The Michigan courts have not developed a principled approach for distinguishing between "ordinary" and "obvious" defects. In another context, however, Michigan courts have defined an "obvious" defect as one that is "visible or well known," "discernible by casual inspection," or "apparent to those of ordinary intelligence." *Glittenberg v. Doughboy Recreational Indus.*, 436 Mich. 673, 695, 462 N.W.2d 348, 358 (1990). To establish liability under the *Huff* exception, then, this design defect must be so readily discernible, well-known, and apparent upon casual inspection that no reasonable manufacturer would make a product so designed. The obvious defect could be apparent from the design itself, such as one allowing volatile fumes in the presence of an open flame; or the design could be proven defective over time by trial, error and ultimate abandonment by others in the industry.

■■ In this case, the plaintiff contends that the latter is the case, i.e., that the multi-strand weftless bead design has been proven to result in explosions when the bead is not properly seated, and therefore that design has been discredited. The plaintiff urges this Court to conclude that the design is "obviously" defective because other tire manufacturers have abandoned it in favor of a single strand wrap design.

Plaintiff relies primarily on the affidavit of his expert, Alan Milner, to establish that a defect existed and that the defect caused the plaintiff's injuries. Milner states that he is an engineer, metallurgist, and product failure analyst with specific knowledge concerning tire/rim assemblies and explosions. He has furnished a detailed report summarizing the progression of the 16/16.5 inch mismatch problem and the manner in which it has been addressed by major tire companies. However, although Milner references several studies and draws conclusions based on those studies, plaintiff has not attached or otherwise supplied the studies that allegedly support his expert's statements.

By way of background, Milner explains that when a tire is installed on a wheel, the tire is positioned on the rim, inflated, and the tire bead "pops" into the wheel's bead seats as the pressure increases upon inflation. Certain light duty truck 16.5 inch wheel rims have a shallow bead seat. The 16.5 inch wheel accepts the 16 inch tire, a collateral problem in and of itself, but upon inflation, the 16 inch tire's bead can fail, which causes the tire to explode.

In his affidavit, Milner asserts that two types of tire bead designs have been used in the manufacture of tires by the tire companies over the last thirty to forty years: a "multi-strand" design, like the design specified by Armstrong and incorporated in the 16 inch tire manufactured by Titan; and a "single-strand" wrap design. Milner states that studies have shown that

[t]he vast majority of tire bead failures occur in tires such as the subject 16 inch tire which employs the so-called multi-strand weftless bead grommet design which is subject to a particular failure mechanism which manifests itself during the bead seating stage of the tire mounting process and causes such beads to fail

at relatively low pressures. However, once the beads of this design are fully seated on the rim base, they present no problem and will sustain inflation pressures well beyond the capacity of ordinary tire inflation equipment.

Milner Aff., attached report, at 20.

In addition, Milner asserts that in 16 inch tire/16.5 inch rim mismatch situations, the multi-strand system's potential for failure is exacerbated thereby increasing the chance of explosion. He reached this conclusion based on four observations involving General Tire, B.F. Goodrich, Firestone, and Goodyear Tire and Rubber Company respectively. The first involved General Tire's decision to adopt the single strand design in 1980. Milner asserts that "failures were prevented." *Id.* at 22. Nevertheless, General Tire reverted to using the multi-strand design (although the reason for this decision is not disclosed by plaintiff or Milner), and bead failures continued. Second, B.F. Goodrich performed a study in 1982 on *passenger* car tires with multi-strand bead designs. Tests indicated that "single strand beads and even modified multi-strand beads had superior minimum failure pressures than the regular multi-strand weftless beads." *Id.* at 23. Third, Firestone adopted a single-strand design in the early 1990's allegedly to prevent tire explosions in 16 inch light truck tires. *Id.* Fourth, the same design was utilized by Goodyear Tire and Rubber Company since the 1970's "without any reported field failures." *Id.*

Milner concludes, therefore, that tire companies have been aware that the multi-strand design causes the 16 inch tire to explode when the tire is placed on a 16.5 inch rim. Furthermore, tire companies have addressed the 16/16.5 inch tire/rim mismatch problem by employing a single-strand bead system with the intent that tire explosions be prevented when tire installers foreseeably and inadvertently place 16 inch tires on 16.5 inch wheel rims.

The Milner affidavit also concedes two important points: that at least one tire manufacturer has resumed the use of a multi-strand weftless bead design, and that the multi-strand weftless bead can sustain inflation pressures well in excess of those normally encountered when properly seated. The seating problem generally occurs when the tire is installed on the wrong-sized rim. Although this misuse of the product may be foreseeable, and it may result in an ordinary design defect, it does not make out a case of an obvious design defect that should not be manufactured at all. Plaintiff has offered no evidence that the product as designed will inevitably lead to failure even when misused. *See, e.g., Lyall v. Leslie's Poolmart, Inc.,* 984 F.Supp. 587, 599 (E.D.Mich.1997). The fact that one design may be better and result in lower failure rates does not mean that an alternate design is defective. Moreover, to establish liability based on *Huff,* the plaintiff must show not only that the design was defective according to the elements enumerated in *Hollister,* but the plaintiff must also show that the design defect was so obvious that no reasonable manufacturer would make the product according to that design. On this record, there is no evidence that the product is dangerous when used as intended. At most, the plaintiff's evidence suggests that a different design may render the product safer when misused. Thus, plaintiff has not offered evidence which creates a triable fact issue on the question of an "obvious" design defect, and therefore the defendant's motion for summary judgment will be granted as to Count I of the complaint.

### B.

Plaintiff alleges in Count II that defendant failed to properly warn him

of the dangers of tire/rim mismatch explosions. In Michigan, to establish a cause of action against a manufacture or seller for a negligent failure to warn, a plaintiff must show that the manufacturer

> (1) had actual or constructive knowledge of the alleged danger, (2) had no reason to believe that consumers would know of this danger, and (3) failed to exercise reasonable care to inform consumers of the danger. In addition, in a negligence action, a plaintiff must establish causation and damages. Where causation is lacking, the question of a duty to warn need not be addressed.

*Peck v. Bridgeport Machines, Inc.,* 237 F.3d 614, 619 (6th Cir.2001) (citations omitted).

In this case, the plaintiff relies on affidavits from Mr. Milner and Dr. Kenneth Laughery, a human factors expert, to establish the elements of his claim. Dr. Laughery avers that the warnings on the tire were inadequate because they were "inconspicuous" to the installer, did not inform of the nature of the hazard and the nature or severity of the consequences, and "studies have shown that service people typically do not read tread labels." Laughery Aff., attached report ¶¶ 2–4. The plaintiff does not state what would be adequate to warn professional tire installers of the dangers associated with mounting a tire on the wrong size rim.

Milner suggests that plaintiff had no constructive knowledge of the danger associated with mismatch by virtue of the warnings on the tire-DO NOT USE ON 16.5 DIA. Laughery infers that there was no reason for defendant to believe that consumers knew about the danger considering that "studies have shown that many people who change tires ... are not aware of the 16 inch tire and 16.5 inch rim mismatch safety problem." Laughery Aff., attached report ¶ 1. Finally, Milner and

Laughery conclude that the warnings on the tire were inadequate which suggest that reasonable care was not exercised to warn consumers of the problem. Milner Aff., attached report, at 25; Laughery Aff., attached report ¶ 4.

The defendant asserts that the warnings were adequate and conspicuous. In addition, the defendant contends that a person's disregard for product warnings constitutes a superseding cause and will relieve the manufacturer of liability. The defendant further argues that it cannot be held liable under a failure to warn theory because the plaintiff qualified as a sophisticated user, and additional warnings would not have been heeded even if defendant provided them.

 Under Michigan law, proof that a plaintiff did not and would not avail himself of available warnings can constitute a superceding cause of an injury. *Coy v. Richard's Indus., Inc.,* 170 Mich.App. 665, 428 N.W.2d 734 (1988). In that case, the plaintiff was injured while parasailing when he crashed in a frozen hayfield. He brought suit against the parasail's retailer on a failure to warn theory. *Id.* at 668, 428 N.W.2d at 736. A jury returned a verdict of no cause of action, and the trial court denied plaintiff's motion for a new trial alleging that the jury was improperly instructed on the issue of causation. The Michigan Court of Appeals affirmed, finding that plaintiff's friend obtained the parasail and failed to thoroughly read a safety manual that warned against landings on hard ground, and that plaintiff was aware that the safety manual was at the friend's home but did not read it. The court stated, "in spite of access that the two men (neither of whom was familiar with overland flights) had to information regarding such flights, both chose to disregard this information." *Id.* at 670–71, 428 N.W.2d at 737. The court also observed that

plaintiff's or his friend's conduct was the superseding cause of plaintiff's injuries. *Id.* at 670, 428 N.W.2d at 737.

Likewise, in *Formella v. Ciba–Geigy Corp.*, 100 Mich.App. 649, 300 N.W.2d 356 (1980), the plaintiffs brought an action against a physician and a drug manufacturer for failure to warn of potential harmful effects of a drug prescribed by the defendant physician. The physician settled the case after one day of trial, and trial court directed a verdict in favor of the manufacturer at the close of plaintiff's proofs. The court of appeals affirmed, finding that although the adequacy of a warning is generally a question for a jury, there was no evidence presented that the manufacturer failed to provide reasonable or adequate warnings. *Id.* at 655, 300 N.W.2d at 358–59. Warnings about side effects were included in the packaging and other publications. *Id.* The prescribing physician's failure to heed the warnings of the manufacturer constituted an "intervening, independent and sole proximate cause" of plaintiff's injuries. *Id.* at 656, 300 N.W.2d at 359.

■ In the present case, warnings were included on the product itself imprinted on the sidewall of the tire, and a sticker was affixed to the tire tread with a red box printed around it directing that the warnings be read. The sticker read "DANGER: READ TIRE SIDEWALL FOR SPECIAL MOUNTING AND USAGE INSTRUCTIONS." Furthermore, it

is uncontested that the plaintiff and his employer disregarded MIOSHA rules,[1] they failed to request or provide proper training, an instructional video was not reviewed or provided to the plaintiff by his employer, and the manufacturer's instructional manual was not consulted. In light of these breaches, plaintiff has not offered any evidence that additional warnings would have been heeded or had a reasonable chance of altering the unfortunate outcome.

■ Finally, as a professional tire installer and retailer, both the plaintiff and his employer were sophisticated users of the product. Mich. Comp. Laws § 600.2947(4) provides, "Except to the extent a state or federal statute or regulation requires a manufacturer to warn, a manufacturer or seller is not liable in a product liability action for failure to provide an adequate warning if the product is provided for use by a sophisticated user." Thus, when the purchaser of the product is a sophisticated user, the manufacturer may reasonably rely upon the purchaser to warn the ultimate user and is relieved of the duty to warn the user directly. *See Tasca v. GTE Products Corp.*, 175 Mich. App. 617, 627, 438 N.W.2d 625, 629 (1988)

■ In this case, although Armstrong as the seller in fact provided warnings about the use and misuse of the tires, QF & F as the operator of an automotive service facility was a sophisticated user of the tires. In *Aetna Casualty and Surety*

---

1. The defendant has identified several rule violations based on the plaintiff's own description of the events. They include: (1) The tire sidewall warned and MIOSHA required Fleck to confirm the compatibility of the tire and rim size, Mich. Admin. Code R. 408.17237(3); (2) The tire sidewall and MIOSHA instructed Fleck to lubricate the beads of the tire before mounting, Mich. Admin. Code R. 408.17235(b); (3) MIOSHA required Fleck to inflate the tire using an extension hose with an a clip-on chuck and in-line gauge, Mich. Admin. Code R. 17235(5); (4) MIOSHA required Fleck to inflate the tire in a restraining device if it is taken off the tire changing machine, Mich. Admin. Code R. 408.17237(8); (5) MIOSHA warned that Fleck should never attempt to use force to seat beads of the tire. Mich. Admin. Code R. 408.17237(8); (6) MIOSHA mandated that Fleck shall not place his body in the trajectory danger zone while inflating the tire.

*Co. v. Ralph Wilson Plastics Co.*, 202 Mich.App. 540, 547, 509 N.W.2d 520, 524 (1993), the court found that "because the employer had an obligation under [MIOSHA] to make information available to the employees that would have made the employees aware of possible dangers, the designation of sophisticated user was particularly appropriate." MIOSHA rules required QF & F to train its employees in the safe use of the products it sold and used within the scope of their employment.

■ Finally, "[t]o establish a prima facie case that a manufacturer's breach of its duty to warn was a proximate cause of an injury sustained, a plaintiff must present evidence that the product would have been used differently had the warnings been given." *Mascarenas v. Union Carbide*, 196 Mich.App. 240, 251, 492 N.W.2d 512, 517 (1992). In the present case, plaintiff admitted that he never read the warnings on the tire tread label outlined in red or embossed on the side of the tire, he never read a safety or instructional manual, and he never sought training beyond a co-worker that "showed him the ropes."

The Court concludes that the plaintiff has failed to offer evidence on several essential elements of his failure to warn claim. The defendant is entitled to judgment as a matter of law, and the Court will dismiss Count II of the complaint.

### C.

■ To sustain an implied warranty claim, the plaintiff must plead and prove that (1) the product in question was defective and (2) the defect caused his injury. *Hollister*, 201 F.3d at 732. A product is defective if it is not reasonably fit for the use intended, anticipated, or reasonably foreseeable. *Latimer v. William Mueller & Son, Inc.*, 149 Mich.App. 620, 632, 386 N.W.2d 618, 623 (1986). Although Michigan courts tend to avoid the terminology,

implied warranty imposes "strict" liability on the manufacturer and vendors of a product. *Cook v. Darling*, 160 Mich. 475, 481, 125 N.W. 411, 413 (1910); *Dooms v. Stewart Bolling & Co.*, 68 Mich.App. 5, 14–15, 241 N.W.2d 738, 746 (1976). In fact, Michigan's implied warranty cause of action is more generous to plaintiffs than the strict liability standard stated in Section 402A of the Restatement (Second) of Torts, as it only requires that the product be unfit for its ordinary purpose, not that it in fact be "unreasonably dangerous." *See generally Dooms*, 68 Mich.App. at 13–15, 241 N.W.2d at 746. The amount of care used by the manufacturer in designing and producing the product is irrelevant. *Gregory*, 450 Mich. at 12, 538 N.W.2d at 329.

■ The plaintiff in this case has offered evidence sufficient to create an issue of fact on the question of whether the tire in this case was defective and that this defect caused the injury. To support these contentions, the plaintiff has submitted the affidavits of two expert witnesses, Alan Milner and Dr. Kenneth Laughery. According to Milner, the entire 16 inch/16.5 inch tire mismatch problem originated in the mid 1960s with the promotion of the 16.5 inch tire size for the first time. Milner Aff., attached report, at 8. The 16.5 inch tire rims, although nominally larger than 16 inch tires, also have slightly smaller diameters than 16 inch tires. Milner Aff., attached report, at 3. Milner avers that as a result, it is easy to mistake the appropriate tire for some 16.5 inch rims. Milner Aff., attached report, at 3.

Milner also states that one common solution to the mismatch problem is to use a single-strand program type bead, and that by 1996, when Titan Tire manufactured the tire at issue in this case, almost all 16 inch light truck tires were using this de-

sign. Milner Aff., attached report, at 2. Titan, however, manufactured 16 inch tires with a multi-strand weftless bead design, including the tire in this case, according to Armstrong's specifications. Milner Aff., attached report, at 2. There is no indication that this alternative design would entail any notable additional costs in manufacturing.

Plaintiff also argues that the mismatch between 16 inch and 16.5 inch tires was foreseeable by Titan. Milner states that it is almost impossible for even qualified servicemen to distinguish between a rims requiring 16 inch and 16.5 inch tires. Milner Aff., attached report, at 2. Sixteen inch tires also seem to fit into rims designed for 16.5 inch tires, and the distinction is often not noticed until the tire explodes or comes apart. Milner Aff., attached report, at 3. Plaintiff's other expert, Kenneth Laughery, supports this contention, stating that a 16 inch tire placed in a 16.5 inch rim will hold air and appear normal. Laughery Aff., attached report, at 3.

It is reasonable to conclude that a 16 inch multi-strand weftless bead design tire is not a merchantable substitute for a true 16.5 inch tire. Based on the evidence stated in the plaintiff's affidavits, a reasonable jury could find that the tire-mismatch problem was foreseeable.

The defendant does not discuss the merits of the implied warranty claim, but only requests that summary judgment be granted "on all claims." However, Michigan courts have made it clear that implied warranty is a separate cause of action, often with distinct proofs. *See generally Bouverette v. Westinghouse Elec. Corp.,* 245 Mich.App. 391, 628 N.W.2d 86 (2001).

Accordingly, plaintiff will be permitted to proceed with his implied warranty claim, and the motion for summary judgment as to Count III of the complaint shall be denied.

IV.

Although the defendant is entitled to judgment as a matter of law on Counts I and II of the complaint, the plaintiff has presented sufficient evidence on Count III to warrant a trial on that count. Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 53] is **GRANTED IN PART AND DENIED IN PART.** Counts I and II of the complaint are **DISMISSED.** The motion is **DENIED** as to Count III of the complaint.

### *OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION*

In an opinion filed on October 4, 2001, this Court held that the plaintiff's negligent manufacturing, design defect and failure to warn claims were dismissed, but that the implied warranty claim shall proceed to trial, thereby granting in part and denying in part the defendant's motion for summary judgment. The defendant has now filed a motion in which he asks the Court to reconsider the matter, claiming that the Court committed palpable error in permitting the implied warranty claim to go forward in light of the Court's other rulings. Titan bases its motion on three grounds. First, Titan argues that the Court's finding that no manufacturing, design or warning defect existed in the accident tire forecloses the finding of a "defect" for implied warranty purposes. Second, Titan alleges that the Court's finding that the plaintiff was a "sophisticated user" compels dismissal of plaintiff's warranty claim as a matter of law. Finally, Titan claims that plaintiff's misuse of the product was a superceding cause of any injury suffered.

I.

The defendant first alleges that a breach of warranty claim requires (1) a defect

*attributable to the manufacturer*, and (2) a causal connection between the alleged defect and the injury to the plaintiff. Because the Court found no manufacturing, design, or warning defect existed that is attributable to Titan, *see* Opinion and Order at 9, the defendant argues that no implied warranty claim will lie.

Initially, the Court notes that it did *not* find that the plaintiff failed to come forward with *any* evidence of a design defect. Rather, the Court held that there was insufficient evidence of an "obvious" defect so as to invoke the rule stated in *Huff v. Ford Motor Co.*, 127 Mich.App. 287, 338 N.W.2d 387 (1983). However, the materials presented by the plaintiff, particularly the affidavit of his expert, Alan Milner, are sufficient to create a question about which reasonable minds might differ as to whether the tire was defectively designed.

Even were this not the case, however, defendant's first argument must fail. It is true generally that there are at least three acknowledged categories of defects in product liability tort actions: manufacturing defects, defects due to design, and defects due to failure to warn. *Restatement (Third) of Torts: Products Liability* § 2 (1998). If Michigan were to adopt the new Restatement exclusively, it would likely find that there was just one type of products liability action. *Id.* cmt. n. Michigan, however, has steadfastly insisted that implied warranty is a distinct products liability claim with different elements. *Lagalo v. Allied Corp.*, 457 Mich. 278, 287 n. 11, 577 N.W.2d 462, 466 n. 11 (1998).

When alleging an implied warranty cause of action, the plaintiff need only show that (1) the product in question was defective when the defendant sold or otherwise placed it in the stream of commerce, and (2) that the defect caused her injury. *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 737 (6th Cir.2000). A product is defective if it is not reasonably fit for its intended, anticipated, or reasonably foreseeable use. *Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 34, 538 N.W.2d 325, 339 (1995). Implied warranty imposes strict liability on the manufacturer and vendors of a product. *Cook v. Darling*, 160 Mich. 475, 481, 125 N.W. 411, 413 (1910); *Dooms v. Stewart Bolling & Co.*, 68 Mich.App. 5, 14–15, 241 N.W.2d 738, 743 (1976). The amount of care used by the manufacturer in designing and producing the product is irrelevant. *Gregory*, 450 Mich. at 12, 538 N.W.2d at 329.

Implied warranty claims do not require the plaintiff to specify the type of defect alleged: the mere showing that *something* went wrong consistent with the existence of a defect is sufficient. *See Caldwell v. Fox*, 394 Mich. 401, 410, 231 N.W.2d 46, 51 (1975); *Severn v. Sperry Corp.*, 212 Mich.App. 406, 413, 538 N.W.2d 50, 54 (1995); *Snider v. Bob Thibodeau Ford, Inc.*, 42 Mich.App. 708, 713, 202 N.W.2d 727, 730 (1972). As a result, the plaintiff need only demonstrate a logical sequence of cause and effect between the alleged defect and the injury. *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 415, 443 N.W.2d 340, 349 (1989). For example, in *Caldwell*, the plaintiff filed suit against a defendant who rear-ended the plaintiff's car, and the defendant, in turn, filed a third-party complaint against General Motors and the dealer who sold him his car. The trial court dismissed the third-party defendants before the case went to the jury, finding there to be "no proof" of a manufacturing defect. 394 Mich. at 406, 231 N.W.2d at 49. Reversing, the Michigan Supreme Court found that the trial court had improperly invaded the province of the jury as fact finder, and that the jury reasonably could have inferred the existence of a defect from the facts stated, and that the defect existed at the time the

product left the manufacturer's control. *Id.* at 410, 231 N.W.2d at 51. An actual defect need not be proven. *Id. See also Snider,* 42 Mich.App. at 713, 202 N.W.2d at 730 (holding that there was no need to specify the defect in the braking mechanism where there was not more than one plausible theory for the accident).

 Because the defect can remain unspecified, the risk-utility test is inapplicable, and expert testimony is often not required. In fact, circumstantial evidence alone can provide a sufficient link between the presence of a likely defect and an injury caused. *Severn,* 212 Mich.App. at 413, 538 N.W.2d at 54; *Caldwell,* 394 Mich. at 410, 231 N.W.2d at 51; *Snider,* 42 Mich. App. at 713, 202 N.W.2d at 730; *Piper v. Tensor Corp.,* 71 Mich.App. 658, 666, 248 N.W.2d 659, 663 (1976) (holding that issues of negligent design and breach of warranty were properly left to the jury where lamp at issue caught fire shortly after being repaired by the defendants, and that expert testimony was not required). The plaintiff has offered an expert's opinion in this case, however.

This point was illustrated recently by the Michigan Court of Appeals in the case of *Bouverette v. Westinghouse Elec. Corp.,* 245 Mich.App. 391, 628 N.W.2d 86 (2001). The plaintiff in that case estate sued when her decedent was electrocuted by a circuit breaker manufactured by one of the defendants. The defendants appealed the jury verdict, claiming that the verdict for the manufacturer on negligence grounds but for the plaintiff on implied warranty grounds was necessarily inconsistent, and that violation of an implied warranty could not occur without negligence. *Id.* at 398, 628 N.W.2d at 92. The Court rejected this view. First, the Court found that the jury following the trial court's instructions plausibly could have limited its negligence analysis to manufacturing and design claims, while treating failure to warn as a separate, implied warranty issue. *Id.* at 398–99, 628 N.W.2d at 92. Second, and more importantly, the Court found that a product could be "defective" without having a traditional "defect" in the product liability sense:

> Moreover, the jury could have found that the breaker itself technically was not defective, but that it was not reasonably fit for the uses intended or foreseeable, i.e., the safety features failed when connected to a linkage handle, which was an intended or foreseeable use.

*Id.* at 399, 628 N.W.2d at 92.

 In this case, the Court finds that Michigan law supports a claim for breach of implied warranty where the manufacturer of a product did not negligently design or manufacture it or failure to issue appropriate warnings, but nonetheless placed the defective product in the stream of commerce. That is because Michigan recognizes a promise implied by law that the product is fit for its foreseeable use. The Court finds no inconsistency in its holdings and no basis to reconsider the question.

## II.

The defendant also argues that *Jodway v. Kennametal, Inc.,* 207 Mich.App. 622, 525 N.W.2d 883 (1994), forecloses an implied warranty claim whenever the plaintiff is found to be a sophisticated user. In *Jodway,* the plaintiffs filed products liability actions against various cobalt suppliers, alleging that they had contracted respiratory illnesses from the defendants' products. *Id.* at 625, 525 N.W.2d at 887–88. The Court first dismissed the plaintiffs' failure to warn claim, finding that the plaintiffs' employer was a sophisticated user. *Id.* at 627–28, 525 N.W.2d at 888–89. The Court then ruled that this finding also precluded recovery under an implied warranty theory:

The same rationale that bars an employee of a sophisticated user from recovering from a supplier *of a dangerous product* on a claim based on a failure to warn theory is also applicable to claims based on an implied warranty theory. A purchaser who has extensive knowledge of a product's inherently dangerous propensities should not be allowed to claim that an implied warranty of merchantability exists as a guaranty against such characteristics.

*Id.* at 631, 525 N.W.2d at 890 (emphasis added). The court of appeals found convincing an unpublished opinion issued from another court in this district which allegedly cited a leading treatise for this proposition. *See id.* (citing *Schmidt v. GTE Prod. Corp.*, No. 84–CV–73715–DT (E.D. Mich. filed Oct. 16, 1986)) (allegedly citing 3 Anderson, *Uniform Commercial Code,* § 2–314:79, at 186 (3d ed.)).

As the Court noted in the original opinion, in federal cases based on diversity jurisdiction, the court must apply state law as pronounced by applicable state's highest court, which in this case is the Michigan Supreme Court, and legislature. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The decisions of the Michigan Court of Appeals are not a binding source of authority, but rather comprise one source of the "relevant data" which this Court uses to ascertain state law. *See Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995). This is especially true if this federal court is convinced that the Michigan Supreme Court would decide the issue differently. *See United of Omaha Life Ins. Co. v. Rex Roto Corp.,* 126 F.3d 785, 789 (6th Cir.1997). "Relevant data" also includes "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broad. Corp.,* 820 F.2d 806, 807 (6th Cir.1987).

There are two reasons why *Jodway* is not controlling here. The first is the nature of its holding, which was not simply that sophisticated users were barred from implied warranty claims; the holding was limited to sophisticated users "of a dangerous product" who have "extensive knowledge of a product's inherently dangerous propensities." *Id.* The defendant has made no showing here that tires are "inherently dangerous products" in the same vein as cobalt dust.

Second, a careful examination of the *Jodway* decision discloses a lack of scholarly and precedential support for its conclusion. The *Jodway* decision purportedly relies on an excerpt from the well-regarded Anderson Uniform Commercial Code treatise. The portions referenced by the court, however, do not support the propositions for which *Jodway* cites them. Specifically, Section 2–314:79 says only that businesses are not covered by consumer protection statutes. 2 Anderson, *Uniform Commercial Code,* § 2–314:79, at 284 (3d ed.1995). Another section, however, says consumer protection statutes are generally irrelevant to Code remedies. *Id.* § 2–314:151 at 351. Nothing on page 186 supports the court's conclusion, *see id.* at 186, nor does any other portion of the treatise which the Court examined. The treatise does contain general authority to the contrary, however. *See id.* § 2–314:531 at 644 ("The fact that the buyer is a merchant does not exclude the buyer from the protection of any warranty that would otherwise arise. That is, warranties arising under the Code in favor of 'buyers' arise without any distinction as to whether they are merchant buyers, casual buyers, or consumer buyers. The warranty of merchantability arises with respect to goods purchased for resale and is not limited to consumer purchases."). A statement re-

motely approaching the court of appeals' conclusion was found in the following excerpt:

> The general knowledge of the plaintiff is irrelevant to a suit on the implied warranty of merchantability as that warranty arises solely because of the merchant status of the defendant as to the kind of goods involved, unless it could be concluded that there was a conscious assumption of a known risk in view of the fact that the buyer had the knowledge.

*Id.* § 2–314:724 at 774. The treatise does not elaborate on this very generalized proposition, nor does it establish the rule which the court of appeals purported to advance.

Another leading treatise states the applicable rules more cogently. *See* White & Summers, *Uniform Commercial Code* (4th ed.1995). White and Summers do not mention any "merchantability" exception for sophisticated commercial entities, although they note that sophisticated users will rarely be able to take advantage of a related theory, the implied warranty of fitness for a particular purpose. 1 White & Summers, § 9–10.

The Court concludes, therefore, that not only is *Jodway* dubious precedent, but its stated holding does not encompass products that are not inherently dangerous, such as the tire in this case.

### III.

■■■■ The defendant alleges that plaintiff's actions constituted a superceding cause of his injuries as a matter of law. Although the plaintiff's own conduct is a source for a legitimate causation defense, particularly in this case, the significance of an intervening cause is generally left to the jury under Michigan law. *Meek v. Dep't of Transp.*, 240 Mich.App. 105, 118, 610 N.W.2d 250, 257 (2000). Michigan also recognizes that multiple causes can be substantial factors leading to injury. *Terry v.*

*City of Detroit*, 226 Mich.App. 418, 430–31, 573 N.W.2d 348, 355 (1997). A jury must decide that issue in this case.

Defendant also claims that this Court failed to apply Mich. Comp. Laws § 600.2947(2) and hold that plaintiff's misuse barred his warranty claim as a matter of law. That provision does state that the Court is to resolve the issue of misuse. Resolution of that issue cannot occur in the absence of a factual predicate. The statute does not require a court to conduct a trial on affidavits. After a proper trial, the Court will rule on the issue of misuse.

### IV.

■■■■ Since the motion before the Court is one seeking rehearing, it is governed by E.D. Mich. LR 7.1(g)(1), which requires the moving party to show (1) a "palpable defect," (2) that the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(g)(3). A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest, or plain. *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F.Supp. 262, 278 (E.D.Mich.1997)(citing Webster's *New World Dictionary* 974 (3d ed.1988)). Further, the Local Rules also provide that any "motions for rehearing or reconsideration which merely present the same issues ruled upon by the Court, either expressly or by reasonable implication, shall not be granted." E.D. Mich. LR 7.1(g)(3).

The defendant has demonstrated neither a palpable defect in this Court's previous opinion, nor any reason why there should be a different disposition of this case. Accordingly, it is **ORDERED** that the defendant's motion for rehearing [dkt # 72] is **DENIED.**